IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Mikal D. Mahdi, #5238, | ) | |
| | ) | C/A No. 8:16-3911-TMC |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Bryan Stirling, Commissioner, South | ) | |
| Carolina Department of Corrections; | ) | |
| Willie D. Davis, Warden, Kirkland | ) | |
| Correctional Institution, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

This matter is before the court on Respondents' motion for summary judgment (ECF No. 105) and motion to strike (ECF No. 125). Petitioner Mikal D. Mahdi ("Mahdi") is a death-sentenced state prisoner who seeks relief under 28 U.S.C. § 2254. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Local Civil Rule 73.02(B)(2), D.S.C., pre-trial proceedings were referred to a magistrate judge. On September 24, 2018, the court withdrew the reference of this matter and now enters an order on the pending motions. (ECF No. 137). Having carefully considered the parties' submissions and the record in this case, the court grants Respondents' motion for summary judgment. (ECF No. 105). In addition, Respondents' motion to strike (ECF No. 125) is granted in part and denied in part.

## BACKGROUND

The following facts are recited, verbatim, from South Carolina Supreme Court Chief Justice Jean Hoefer Toal's concurring opinion in Mahdi's direct appeal:

1

On July 14, 2004, Petitioner, then a resident of Virginia, embarked on a crime spree that would span four states. Petitioner stole a .380 caliber pistol from his neighbor, a set of Virginia license plates, and a station wagon. Petitioner left Virginia and headed to North Carolina.

On July 15, Petitioner entered an Exxon gas station in Winston-Salem, North Carolina armed with the .380 pistol. Petitioner took a can of beer from a cooler and placed it on the counter. The store clerk, Christopher Jason Boggs, asked Petitioner for identification. As Boggs was checking Petitioner's identification, Petitioner fatally shot him at point-blank range. Petitioner fired another shot into Boggs as he lay on the floor. Petitioner then attempted unsuccessfully to open the store's cash register. Petitioner left the store with the can of beer, and headed to South Carolina.[1]

Early in the morning of July 17, Petitioner approached Corey Pitts as he sat at a traffic light in downtown Columbia, South Carolina. Petitioner stuck his gun in Pitts' face, forced him out of his car, and stole Pitts' Ford Expedition. Petitioner replaced the Expedition's license plates with the plates he had stolen in Virginia, and headed southeast on I-26.

About thirty-five minutes down the road, Petitioner stopped at a Wilco Hess gas station in Calhoun County and attempted to buy gas with a credit card. The pump rejected the card, and Petitioner spent forty-five minutes to an hour attempting to get the pump to work. Due to his suspicious behavior, the store clerks called the police. Aware that the clerks' suspicions had been alerted, Petitioner left the Expedition at the station and fled on foot through the woods behind the station.

About a quarter to half mile from the station, Petitioner came upon a farm owned by Captain James Myers, a thirty-one year veteran law enforcement officer and fireman. Petitioner broke into a work shop on the Myers property. Once inside the work shop, Petitioner watched television and examined Myers' gun collection. Petitioner found Myers' shotgun and used the tools in the shop to saw off the barrel and paint it black. Petitioner also took Myers' .22 caliber rifle and laid in wait for Myers.

That day, Myers had been at the beach celebrating the birthdays of his wife, sister, and daughter. Myers had visited with his father before returning to his farm. Upon arriving at the farm, Myers stopped by the work shop, where he was confronted by Petitioner. Petitioner shot Myers nine times with the .22 rifle. Petitioner then poured diesel fuel on Myer's [sic] body and set the body on fire. Petitioner stole Myers' police-issued truck, and left with Myers' shotgun, his .22 rifle, and Myers'

---

[1]Mahdi has since pled guilty to first-degree murder in the death of Mr. Boggs and received a life sentence in North Carolina. (ECF No. 51-1 at 56 n.4).

police-issued assault rifle.

Later that evening, Myers' wife, also a law enforcement officer, became worried when Myers did not return home. Mrs. Myers drove to the work shop and discovered Myers' burned body lying in a pool of blood.

Petitioner escaped to Florida, where he was spotted by police on July 21 driving Myers' truck. Fleeing the police, Petitioner abandoned the truck [and proceeded] on foot in possession of the assault rifle. When cornered by police, Petitioner abandoned the rifle and was eventually taken into custody.

*Mahdi v. State*, 678 S.E.2d 807, 809 (S.C. 2009) (Toal, C.J., concurring) (footnote added).

## PROCEDURAL HISTORY

### *Guilty Plea & Sentencing*

On August 23, 2004, the Calhoun County grand jury indicted Mahdi for murder, grand larceny, and second degree burglary, and the State filed its Notice of Intent to Seek the Death Penalty. (ROA 1829-35).[2] The South Carolina Supreme Court ordered South Carolina Circuit Court Judge Clifton Newman to preside over Mahdi's case. (ROA 1841). Judge Newman appointed attorneys Carl Grant and Glenn Walters to represent Mahdi. (ROA 8). However, in 2016, upon Grant's motion and with the State and Mahdi's consent, the court relieved Mr. Grant as counsel because he had sustained a serious injury in a motorcycle accident. (ROA 104-05). Mr. Walters replaced Mr. Grant as lead counsel and the court appointed Joshua Koger, Jr., as second chair counsel. (ROA 109).

From November 26th to 29th, 2006, the parties engaged in individual *voir dire* and selected a capital jury. (ROA 207-1318). However, on November 30th, prior to the jury being sworn, Mahdi waived his right to a jury trial and pled guilty to all charges. (ROA 1336-68). Following the

---

[2]The Record on Appeal can be found at ECF Nos. 31-5 to 31-12.

mandatory twenty-four hour statutory waiting period, Mahdi's sentencing proceeding before Judge

Newman began on December 4, 2006. (ROA 1372). As aggravating circumstances, the State

alleged that Mahdi: (1) committed the murder during the commission of a burglary; (2) committed

the murder during the commission of a larceny with a deadly weapon; (3) committed the murder

during the commission of a robbery while armed with a deadly weapon; and (4) murdered a law

enforcement officer during or because of the performance of his official duties. (ROA 1838). Judge

Newman found the State proved the first two aggravating circumstances beyond a reasonable doubt

and, after carefully considering all of the evidence, sentenced Mahdi to death. (ROA 1810-26).

### *Direct Appeal*

On direct appeal, Mahdi raised one issue:

Did the trial judge improperly consider Mikal Mahdi's initial exercise of his
constitutional right to a trial by jury in imposing a death sentence?

(ECF No. 31-1 at 3). On June 15, 2009, the South Carolina Supreme Court affirmed Mahdi's

sentence. *See Mahdi v. State*, 678 S.E.2d 807 (S.C. 2009). (App. A000193).[3] Mahdi did not appeal

this decision, but moved for a stay of execution in order to pursue post-conviction relief ("PCR").

On July 23, 2009, the South Carolina Supreme Court granted Mahdi's motion and assigned South

Carolina Circuit Court Judge Doyet A. Early, III, to preside over Mahdi's PCR action.

### *First PCR Action*

On August 18, 2009, Mahdi filed his initial PCR application *pro se*. (App. A000853-59).

Through appointed counsel, Teresa Norris and Robert Lominack, Mahdi amended his application

and raised the following grounds:

---

[3]The Appendix can be found at ECF Nos. 32-1 through 34-2.

10(a) *Applicant was denied the effective assistance of counsel during the sentencing phase of his trial in violation of South Carolina law and the Sixth and Fourteenth Amendments to the United States Constitution.*

11(a)(I) Trial counsel failed to object when the trial judge improperly based his decision to impose a death sentence on petitioner's assertion of his right to a jury trial, thereby effectively punishing him for exercising this constitutional right. Counsel's deficient performance in failing to preserve the issue for appellate review deprived petitioner of the right to effective assistance of counsel.

(ii) Counsel failed to adequately advise Applicant of the advantages of jury sentencing, which resulted in the Applicant pleading guilty and purporting to waive his right to jury sentencing.

(iii) Counsel failed to adequately investigate, develop, and present mitigation evidence concerning Applicant's family, social, institutional, and mental health history.

(iv) Counsel failed to assert that Applicant's death sentence violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution due to Applicant's developmental deficits.

(v) Counsel failed to assert that S.C. Code § 16-3-20 is unconstitutional in that it automatically precludes jury sentencing following a guilty plea in violation of the Sixth, Eighth, and Fourteenth Amendments as addressed in *Ring v. Arizona*, 536 U.S. 584 (2002). Moreover, this statute forces a capital defendant to choose between his right to a jury trial and his right to present mitigating evidence, namely that he has accepted responsibility for the crime. While this issue has been rejected by state courts, *see State v. Downs*, 361 S.C. 141, 604 S.E.2d 377 (2004), it has not been reviewed by federal courts and counsel were thus ineffective in failing to adequately preserve the record for subsequent litigation.

Counsel's conduct in each instance separately and cumulatively was both unreasonable and prejudicial in sentencing. *Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Council v. State*, 380 S.C. 159, 670 S.E.2d 356 (2008).

10(b) *Applicant's death sentence violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution due to Applicant's developmental deficits.*

11(b) At the time of the offenses, Applicant was developmentally impaired such that he had the "mental age" of a juvenile due to his atrocious background of

5

deprivation, neglect, abuse, and institutionalization. The Cruel and Unusual
Punishment Clause precludes the infliction of the death penalty upon him, just as it
precludes execution of those under the age of 18 at the time of the offenses, because
of these grave developmental deficits. *See Roper v. Simmons*, 543 U.S. 551 (2005).

(App. A000458-62) (emphasis in original).

From March 9th to 11th, 2011, the PCR court held an evidentiary hearing on Mahdi's

application. (App. A001240-1960). After considering all of the evidence, the PCR court dismissed

Mahdi's application. (App. A000011-58). In Ground 10(a)/11(a)(iii), the PCR court found trial

counsel failed to conduct an adequate mitigation investigation, but that this deficiency did not

prejudice Mahdi. The State moved to alter or amend that finding (*see* App. A000787-852); the PCR

court heard argument on the State's motion (App. A001204-1232); and, on August 20, 2014, the

PCR court filed an amended order of dismissal, finding trial counsel had adequately investigated

potential mitigating evidence. (App. A000059-191 ("PCR Order")). On August 27, 2014, Mahdi

moved to alter or amend the amended order (App. A000257-59), and the PCR court denied Mahdi's

motion on September 9, 2014 (App. A000192).

### *PCR Appeal*

Mahdi, through counsel Seth C. Farber, Brandon W. Duke, and Teresa L. Norris, appealed

the PCR court's decision by filing a petition for a writ of certiorari to the South Carolina Supreme

Court raising one issue:

> Was Petitioner denied the effective assistance of counsel at his capital sentencing
> proceeding by trial counsel's decision to rely entirely on a single expert witness to
> present mitigating evidence about petitioner's background instead of calling available
> lay witnesses who could have provided detailed and specific testimony in mitigation?

(ECF No. 31-18 at 5). On September 8, 2016, after full briefing by the parties, the Supreme Court

of South Carolina denied the petition. (ECF No. 31-21). Remittitur issued on September 26, 2016.

(ECF No. 31-22).

Mahdi petitioned the United States Supreme Court for certiorari review of the South Carolina

Supreme Court's decision, presenting virtually the same issue:

> Whether counsel in a capital sentencing proceeding can, consistent with this Court's
> holdings in *Williams v. Taylor*, 529 U.S. 362 (2000), and its progeny, properly rely
> exclusively on expert testimony and forgo calling available lay witnesses with
> detailed, firsthand information about mitigating circumstances in the defendant's
> background.

(ECF No. 51-1 at 2). The United States Supreme Court denied certiorari on February 21, 2017.

(ECF No. 51-4).

### *Second PCR Action*

On January 10, 2017, after filing the instant federal habeas petition, Mahdi through his

federal habeas counsel filed a second PCR application, raising the following grounds:

> 10) Statement of grounds for relief:

> a) S.C. Code Ann. § 16-3-20, which requires a judge to sentence the
> defendant following a guilty plea, violates the Sixth Amendment of the United States
> Constitution, which is applicable to the states through the Fourteenth Amendment,
> because a judge rather than a jury finds facts required for imposition of a death
> sentence. *Hurst v. Florida*, __U.S.__, 136 S.Ct. 616 (2016).

> b) Mr. Mahdi was denied the right to effective assistance of
> counsel—guaranteed by the Sixth and Fourteenth Amendments to the United States
> Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution—during
> the guilt-or-innocence phase of his capital trial because his trial counsel advised him
> that the guilty plea would be considered as mitigation.

> c) Pursuant to *Austin v. State*, 305 S.C. 453, 409 S.E.2d 395 (1991), Mr.
> Mahdi seeks an appeal on the following grounds for relief and supporting facts raised
> in his initial application for post-conviction relief (Case No. 2009-CP-09-164), as
> amended:

> > ■ Applicant was denied the effective assistance of counsel during the
> > sentencing phase of his trial in violation of South Carolina law and

the Sixth and Fourteenth Amendments to the United States Constitution.

-- Trial counsel failed to object when the trial judge improperly based his decision to impose a death sentence on petitioner's assertion of his right to a jury trial, thereby effectively punishing him for exercising this constitutional right. Counsel's deficient performance in failing to preserve the issue for appellate review deprived petitioner of the right to effective assistance of counsel.

-- Counsel failed to adequately advise Applicant of the advantages of jury sentencing, which resulted in the Applicant pleading guilty and purporting to waive his right to jury sentencing.

-- Counsel failed to adequately investigate, develop, and present mitigation evidence concerning Applicant's family, social, institutional, and mental health history.

-- Counsel failed to assert that Applicant's death sentence violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution due to Applicant's developmental deficits.

-- Counsel failed to assert that S.C. Code Section 16-3-20 is unconstitutional in that it automatically precludes jury sentencing following a guilty plea in violation of the Sixth, Eighth, and Fourteenth Amendments as addressed in *Ring v. Arizona*, 536 U.S. 584 (2002). Moreover, this statute forces a capital defendant to choose between his right to a jury trial and his right to present mitigating evidence, namely that he has accepted responsibility for the crime. While this issue has been rejected by state courts, *see State v. Downs*, 361 S.C. 141, 604 S.E.2d 377 (2004), it has not been reviewed by federal courts and counsel were thus ineffective in failing to adequately preserve the record for subsequent litigation.

■ Applicant's death sentence violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution due to Applicant's developmental deficits.

-- At the time of the offenses, Applicant was developmentally

impaired such that he had the "mental age" of a juvenile due to his atrocious background of deprivation, neglect, abuse, and institutionalization. The Cruel and Unusual Punishment Clause precludes the infliction of the death penalty upon him, just as it precludes execution of those under the age of 18 at the time of the offenses, because of these grave developmental deficits. *See Roper v. Simmons*, 543 U.S. 551 (2005).

d) If the State contends that any of the grounds for relief identified in paragraph 10(c) were not ruled on by the initial post-conviction relief judge, then Mr. Mahdi seeks a ruling so that he may appeal.

(ECF No. 46-1 at 2-4).

The State responded to Mahdi's application, asserting that it should be dismissed as improperly successive and time barred. (*See* ECF No. 46-2). The second PCR court heard argument on the State's motion and, on June 29, 2017, dismissed Mahdi's application on procedural grounds. (ECF No. 66-1). Mahdi moved to alter or amend the court's order (ECF No. 103-6), and the court denied that motion (ECF No. 79-1).

Mahdi appealed the second PCR court's order. (ECF No. 103-8). On April 19, 2018, the South Carolina Supreme Court found Mahdi had failed to show an arguable basis for asserting the lower court's determination was improper and dismissed the matter. (ECF No. 126-1). Mahdi filed a petition for rehearing (ECF No. 135-1), which the South Carolina Supreme Court denied on June 27, 2018 (ECF No. 135-2). Remittitur issued the same day. (ECF No. 135-3).

### *Federal Habeas Corpus*

On September 26, 2016, Mahdi filed this habeas petition under § 2255. (ECF No. 1). He filed an amended petition (the "Amended Petition") on September 7, 2017, raising the following grounds for relief:

I.      Mr. Mahdi was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments when trial counsel failed to object to the State's use of full body restraints, both at the detention center and in the courtroom, when the restraints were an uncomfortable "torture" and "torment" at the detention center and would be highly visible to the jurors in the courtroom, in violation of *Deck v. Missouri*, 544 U.S. 622 (2005), thereby rendering Mr. Mahdi's guilty plea involuntary in violation of *Boykin v. Alabama*, 395 U.S. 238 (1969).

II.     Mr. Mahdi was denied the right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution at the sentencing phase of his trial when trial counsel failed to adequately investigate, develop, and present mitigation evidence.

III.    S.C. Code Ann. § 16-3-20 is unconstitutional in that it automatically precludes jury sentencing following a guilty plea in violation of the Sixth and Fourteenth Amendments to the United States Constitution as addressed in *Hurst v. Florida*, __U.S.__, 136 S. Ct. 616 (2016), which is a new rule of constitutional law that applies retroactively to Mr. Mahdi's death sentence.

IV.     Mr. Mahdi was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments when trial counsel failed to assert that S.C. Code Ann. § 16-3-20 is unconstitutional in that it automatically precludes jury sentencing following a guilty plea in violation of the Sixth, Eighth, and Fourteenth Amendments as addressed in *Ring v. Arizona*, 536 U.S. 584 (2002).

V.      Mr. Mahdi was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments when trial counsel failed to adequately advise him of the advantages of jury sentencing, which resulted in Mr. Mahdi pleading guilty and purporting to waive his right to jury sentencing.

VI.     Mr. Mahdi was denied the right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments when trial counsel advised him that the guilty plea would be considered as mitigation.

VII.    Mr. Mahdi was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments when trial counsel failed to object when the trial judge improperly based his decision to impose a death sentence on Mr. Mahdi's assertion of his right to a jury trial, thereby effectively punishing him for exercising this constitutional right.

(ECF No. 75 at 9-41).

## APPLICABLE LAW

### *Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine factual issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the nonmoving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the nonmoving party must identify specific, material facts that give rise to a triable issue of material fact. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the nonmovant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248. "Only disputes over

11

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."

*Id.* Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

### Habeas Corpus

Because Mahdi filed the Petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d). *Lindh v. Murphy*, 521 U.S. 320 (1997); *Breard v. Pruett,* 134 F.3d 615 (4th Cir. 1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision," and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101–02 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Moreover, state court factual determinations are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### Exhaustion & Procedural Bar

A habeas corpus petitioner may obtain relief in federal court only after he has exhausted his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "To satisfy the exhaustion requirement, a habeas petitioner must present his claims to the state's highest court." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997), abrogated on other grounds by *United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011); *see also In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, 471 S.E.2d 454, 454 (S.C. 1990) (holding that "when the claim has been presented to the Court of Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies"). To exhaust his available state court remedies, a petitioner must "fairly present[] to the state court both the operative facts and the controlling legal principles associated with each claim." *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks and citation omitted). Thus, a federal court may consider only those issues which have been properly presented to the state appellate courts with jurisdiction to decide them. Generally, a federal habeas court should not review the merits of claims that would be found to be

procedurally defaulted (or barred) under independent and adequate state procedural rules. *Lawrence v. Branker*, 517 F.3d 700, 714 (4th Cir. 2008); *Longworth*, 377 F.3d 437; *see also Coleman v. Thompson*, 501 U.S. 722 (1991). For a procedurally defaulted claim to be properly considered by a federal habeas court, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

In South Carolina, a person in custody has two primary means of attacking the validity of his conviction: (1) through a direct appeal or (2) by filing an application for PCR. State law requires that all grounds for relief be stated in the direct appeal or PCR application. S.C. App. Ct. R. 203; S.C. Code Ann. § 17-27-90; *Blakeley v. Rabon*, 221 S.E.2d 767, 770 (S.C. 1976). If the PCR court fails to address a claim as required by S.C. Code Ann. § 17-27-80, counsel for the applicant must make a motion to alter or amend the judgment. S.C. R. Civ. P. 59(e). Failure to do so will result in the application of a procedural bar to that claim by the Supreme Court of South Carolina. *Marlar v. State*, 653 S.E.2d 266 (S.C. 2007).[4]

In addition, the Supreme Court of South Carolina will refuse to consider claims raised in a second appeal that could have been raised at an earlier time. *See* S.C. Code Ann. § 17-27-90; *Aice v. State*, 409 S.E.2d 392, 394 (S.C. 1991). Further, if a prisoner has failed to file a direct appeal or a PCR application and the deadlines for filing have passed, he is barred from proceeding in state

---

[4]In *Bostick v. Stevenson*, 589 F.3d 160 (4th Cir. 2009), the Fourth Circuit found that, prior to the Supreme Court of South Carolina's November 5, 2007 decision in *Marlar*, South Carolina courts had not uniformly and strictly enforced the failure to file a motion pursuant to Rule 59(e) as a procedural bar. 589 F.3d at 162-65. Accordingly, for matters in which there was a PCR ruling prior to November 5, 2007, the court will not consider any failure to raise issues pursuant to Rule 59(e) to effect a procedural bar.

court.  S.C. App. Ct. R. 203(d)(3), 243.  If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar.  *See Reed v. Ross*, 468 U.S. 1, 11 (1984); *see also Kornahrens v. Evatt*, 66 F.3d 1350, 1357 (4th Cir. 1995).  As the United States Supreme Court explained:

> . . . [State procedural rules promote] not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case.

*Reed*, 468 U.S. at 10-11.

### Ineffective Assistance of Counsel

In *Strickland v. Washington*, the United States Supreme Court established that to challenge a conviction based on ineffective assistance of counsel, a prisoner must prove two elements: (1) his counsel was deficient in his representation and (2) he was prejudiced as a result.  466 U.S. 668, 687 (1984).  To satisfy the first prong, a prisoner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  To satisfy the second prong, a prisoner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 692.  The Court cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential," and "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

In the specific context of a guilty plea, the prejudice prong of *Strickland* requires the prisoner to show that "there is a reasonable probability that, but for counsel's errors, [the prisoner] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59

(1985).  The Supreme Court further explained,

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial.  For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.  This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. . . . As we explained in *Strtickland v. Washington*, these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker."

*Hill*, 474 U.S. at 59-60 (citations omitted).

When evaluating a habeas petition based on a claim of ineffective assistance of counsel, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard."  *Richter*, 562 U.S. at  101.  "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."  *Id.*; *see also Yarborough v. Gentry*, 540 U.S. at 6 (stating judicial review of counsel's performance is "doubly deferential when it is conducted through the lens of federal habeas").  If a state court decision questionably constitutes an unreasonable application of federal law, the "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, in such situations, the habeas court must determine whether it is possible for fairminded jurists to disagree that the arguments or theories supporting the state court's decision are inconsistent with Supreme Court precedent.  *Id.*

## DISCUSSION

Before diving into the intricacies of the parties' substantive arguments, the court must address some preliminary matters raised in the briefs.

In his Response, Mahdi requests an evidentiary hearing under Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts on all of his habeas grounds. (ECF No. 113 at 2).[5] Under the AEDPA, evidentiary hearings are generally prohibited even when a habeas petitioner has failed to develop the factual basis of a claim in his state court proceedings. 28 U.S.C. § 2254(e)(2); *see Cullen v. Pinholster*, 563 U.S. 170, 181-84 (2011) (recognizing both that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" and also that for claims for which the factual basis was not developed in state court "§ 2254(e)(2) bars a federal court from holding an evidentiary hearing, unless the applicant meets certain statutory requirements"). However, the statute itself creates an exception to the general rule if the petitioner can show that the claim relies on a new, retroactive rule of constitutional law or "a factual predicate that could not have been previously discovered through due diligence[,]" and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id.*

Thus, the Fourth Circuit has recognized:

A petitioner who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if

---

[5]Rule 8 states: "If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."

he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963).

*Juniper v. Zook*, 876 F.3d 551, 563 (4th Cir. 2017) (quoting *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006)).  The six *Townsend* factors are:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313.  For the reasons that follow, the court finds Mahdi has failed to show he is entitled to an evidentiary hearing on any of his preserved claims under this standard.  Mahdi has also requested a hearing on his defaulted claims, and the court will address those requests when it analyzes the merits of each related ground.

In addition, Mahdi has requested expansion of the record under Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts.[6]  (ECF No. 113 at 2).  Mahdi attached five extra-record exhibits to his Response—an affidavit from habeas counsel's mitigation investigator, emails from habeas counsel requesting a transcript from the second PCR hearing, a 2012 affidavit from PCR counsel regarding guilty pleas in capital cases, and affidavits from each PCR attorney regarding actions taken in PCR proceedings after the release of two Supreme Court decisions.[7]  (ECF Nos. 113-1 through 113-5).  Respondents oppose the court's consideration of the

---

[6]Rule 7 states: "If the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition.  The judge may require that these materials be authenticated."

[7]In addition, Mahdi noted he was "in the process of procuring affidavits from Mr. Mahdi and Mr. Mahdi's North Carolina counsel that [would] be consistent with, and support, the arguments and

attached affidavits[8] and have moved to strike those exhibits. (ECF No. 125). The court will address

Mahdi's request to expand the record and Respondents' motion to strike in its discussion of the

grounds to which they apply.

Finally, Mahdi contends the PCR court wrongfully "ced[ed] its factfinding authority to the

State by" adopting, nearly wholesale, the State's proposed order, thus undercutting the

reasonableness of the PCR court's factual determinations. (ECF No. 113 at 5-6). In federal habeas

proceedings, a state court's factual determinations are presumed correct and the petitioner has the

burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §

2254(e)(1). The Supreme Court has questioned a state court's factfinding procedures based on its

verbatim adoption of one party's proposed order. *Jefferson v. Upton*, 560 U.S. 284, 292 (2010).

However, in *Jefferson*, the state court solicited the proposed order ex parte, did not provide the

opposing party an opportunity to criticize the order's findings or submit his own, and adopted

findings that contained evidence not before the court. *See id.* at 294. And, the Court noted that

although it had previously stated "that a court's 'verbatim adoption of findings of fact prepared by

prevailing parties' should be treated as findings of the court," it had "also criticized that practice."

*Id.* at 293-94 (quoting *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 572

(1985)).

In this case, the PCR court's initial order of dismissal included findings favorable to Mahdi.

_____

factual background" in the Response and that he would file those affidavits once he received them.
(ECF No. 113 at 2 n.1). However, no additional affidavits appear on the docket and Mahdi has not
referenced any in later filings.

[8]Respondents express no opinion on Exhibit 2, habeas counsel's emails. (*See* ECF No. 125
at 1).

(*See* App. A000011-58). The State moved to alter or amend those findings and the PCR court held a hearing on the State's motion. At the end of the hearing, the PCR court directed the State to submit a proposed amended order of dismissal. The State submitted a 148-page proposed order, copying opposing counsel. (*See* App. A000616-783). Mahdi filed objections to the State's proposed order (App. A001012-23) and the PCR court ultimately issued its 133-page decision (App. A000059-190). This record suggests the PCR court considered both parties' arguments and reviewed and edited the State's order before adopting the majority of it. While adopting a party's proposed order is a disfavored practice, especially in a capital case, Mahdi has failed to show by clear and convincing evidence that the PCR court's factual findings are not entitled to a presumption of correctness.

### GROUND ONE – THE SHACKLES

In Ground One, Mahdi asserts his trial counsel were ineffective for failing to object to the use of full body restraints both at the detention center and in the courtroom. (ECF No. 75 at 9-14). Mahdi contends the full body restraints were an unnecessary form of torture and torment and their use influenced his decision to plead guilty, thereby rendering his plea involuntary. (ECF No. 75 at 13). Respondents counter that the restraints were justified, and trial counsel had no basis for an objection because Mahdi told the trial court the restraints did not influence his plea. (ECF No. 104 at 37-42). This claim was not raised in state court and is, therefore, defaulted. However, Mahdi argues cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012), asserting the ineffectiveness of his PCR counsel for failing to present this claim in his PCR application.

Inadequate assistance of counsel "at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial," *id.* at 9, where:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 564 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14, 17-18).

Thus, Mahdi must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that . . . the claim has some merit," *Martinez*, 566 U.S. at 14 (comparing *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability)), and that his PCR counsel were ineffective under *Strickland* for not raising that claim. As applied to guilty pleas, *Strickland*'s deficiency prong remains the same, but to prove prejudice, Mahdi must show that "there is a reasonable probability that, but for counsel's errors, [he] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. at 59.

Mahdi began his court proceedings in leg braces, which were strapped onto his legs and locked into place, and worn under Mahdi's clothing. (App. A003540). However, after one day in the leg braces, Mahdi requested leg irons, which are described as "oversized handcuffs that fit around the ankles with a chain in between." (App. A003196, A003540). The sheriff discussed Mahdi's request with his attorneys and the court, and then switched Mahdi to leg irons. (App. A003540). Mahdi had no other restraints. (App. A003543).

After voir dire and related motions, outside the presence of the jury, Solicitor Pascoe informed the court the security team had found a handmade handcuff key in Mahdi's pocket. (App. A003194). Mahdi admitted to making the key at the detention center. (App. A003195, A003542-

43).  He hid the key in his mouth and brought it to the courthouse on multiple days, but was unable to get the key from his mouth to his hand until he had a private meeting with his attorneys, outside the presence of deputies.  (App. A003194-95, A003542).  Security officers found the key during a search after that meeting and before Mahdi returned to the courtroom.  (App. A003541).  Mahdi admitted to trying to use the key to remove his leg irons.[9]  (App. A003194, A003195).  As a result, the sheriff recommended that the court consider securing Mahdi's hands, but indicated handcuffs would be visible if Mahdi placed his hands on top of the defense table.  (App. A003195, A003196-97).

Judge Newman asked for input from both the solicitor and defense counsel.  Solicitor Pascoe agreed with the sheriff and endorsed shackling Mahdi's hands and legs and using "any means possible to make sure the courthouse is secure."  (App. A003195).  Mr. Walters stated:

> Your Honor, certainly, we want to keep the public safe.  And the events that have just occurred were just brought to my attention by the Sheriff.  And, of course, I haven't conferred with my client to discuss exactly what he said to the Sheriff, but, evidently, they had a conversation.
>
> At this point, we would abide by any rulings of the Court.  And I appreciate the Sheriff brought it to my attention and - - I was talking to the Solicitor and it was brought to our attention.  And, certainly, I understand their position of putting it on the record.  What more can be said.

(App. A003196).

Judge Newman then instructed the sheriff:

> Sheriff, at this point, I will certainly agree that security is imperative. . . .
>
> I believe that if you would use the leg irons, in addition to the chains, but, at this point, I would not want to have him shackled in the presence of the jury with his

---

[9]The sheriff tested the key that day and was able to open two out of three pairs of handcuffs. (App. A003543).

shackles being visible due to the effect that it may have on his right to a fair trial. We'll step up the measures and if anything further happens, I'm sure you'll be on top of it and we can address it from there. Thank you very much.

(App. A003197). The court then brought the jurors back in and dismissed them for the night. (App. 3198-3200). After the jury's dismissal, in an ex parte meeting, Mr. Walters indicated Mahdi was considering pleading guilty, but wanted additional time to think about it and consult with his grandmother. (App. A003207-08). The next day, before the jury arrived, Mr. Walters indicated Mahdi wanted to plead guilty to all charges. (App. A003212). The court held a brief competency hearing (App. A003215-19), and then began the plea colloquy (App. A003219).

As part of the colloquy, the court asked Mahdi if he had any complaints about his lawyers, the solicitor, or any of the police officers involved in his case (App. A003229), prompting the following exchange:

**DEFENDANT MAHDI**: I was kept in full body restraints all night last night. And I was told that I was going to be kept in full body restraints through the whole trial all day, all night, Your Honor. And that's my complaint.

While I'm in a secure cell at the detention center, there is completely no need for me to be in full body restraints while in the cell. That's my only complaint, Your Honor.

**THE COURT**: And has that fact had any bearing whatsoever on your decision to plead guilty?

**DEFENDANT MAHDI**: I'd be lying if I said I didn't.

**THE COURT**: Sir?

**DEFENDANT MAHDI**: I'd be lying if I said it didn't.

**THE COURT**: The fact that you have been placed in a full body restraint, has - -

**DEFENDANT MAHDI**: All night.

**THE COURT**: All night - -

23

**DEFENDANT MAHDI**: Yes, sir.

**THE COURT**: Has that caused you to decide to plead guilty?

**DEFENDANT MAHDI**: Your Honor, there wasn't no - - it wasn't a very, you know, very big reasons. It's a small like a slight diversion, you know.

**THE COURT**: A slight diversion?

**DEFENDANT MAHDI**: Yeah, a slight diversion, but it's not nothing - - it's nothing major. There was no major persuasive mood. It's mostly irritating, extremely irritating. And I felt it was unnecessary. I'm in a secure cell, a secure location and it's just a means to hassle me, that's what I felt it was.

**THE COURT**: Means to do what?

**DEFENDANT MAHDI**: It's a means to hassle me.

**THE COURT**: To hassle you?

**DEFENDANT MAHDI**: Yeah. Yes, sir, Your Honor. But I, in no way, feel that that, you know, it's almost petty, you know, it's childish to me that the director of the Orangeburg Detention Center will resort to that childish ways, you know.

Yeah, and I said that on television. The Orangeburg director of the detention center is childish. He resorted to childish ways, okay, Your Honor, and - - but in no way, did that persuade me to plead guilty. It's just irritating. And I feel that - - I feel that it was unnecessary, Your Honor. It was extremely unnecessary.

But as far as Calhoun County, they did not mistreat me. I was not coerced in any way by this county to plead guilty.

**THE COURT**: Do you wish to proceed with the guilty plea?

**DEFENDANT MAHDI**: Yes, Your Honor. I just felt it was necessary to mention that.

**THE COURT**: Are you, in fact, guilty of the charges against you.

**DEFENDANT MAHDI**: Yes, sir, Your Honor.

(App. 003229-31). Contrary to the record, Mahdi now contends that he pled guilty because of the

full body restraints.

Mahdi first contends that "[i]f trial counsel had objected pursuant to *Deck v. Missouri*, 544 U.S. 622 (2005), then the trial judge would have inquired further into the matter." (ECF No. 113 at 12). "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629. Here, after security discovered Mahdi's homemade key, Judge Newman reasonably determined that Mahdi should be more securely restrained. Thus, Judge Newman made a case-specific determination, on the record, because of a security problem and risk of escape, that shackling Mahdi was necessary. This is exactly the type of individualized security determination contemplated in *Deck*. *See id.* ("Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial."); *id.* at 632 ("We do not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations. We are mindful of the tragedy that can result if judges are not able to protect themselves and their courtrooms."). However, Judge Newman also expressed his concern regarding Mahdi's due process rights and indicated he should not be shackled "in the presence of the jury." (App. A003197).

Judge Newman found Mahdi's escape plan justified "stepping up" Mahdi's restraints, but that those restraints should not be used in front of the jury. (*See* App. A003197 ("I believe that if you would use the leg irons, in addition to the chains, but, at this point, I would not want to have him shackled in the presence of the jury with his shackles being visible . . . .")). And, the record indicates

the potential jurors never saw Mahdi's restraints.[10]  Trial counsel had no reason to object pursuant to the holding in *Deck*.[11]

Mahdi also argues that the use of full body restraints while at the detention center was intended to "hassle" Mahdi and caused him to plead guilty.  (ECF Nos. 113 at 15-16).  Mahdi contends that trial counsel should have objected on the ground that these enhanced security measures exceeded the scope of Judge' Newman's order, and requested another hearing to determine whether full body restraints were necessary at the detention center.  (ECF No. 113 at 13, 16).

Even if trial counsel were somehow deficient, Mahdi has not offered any evidence, other than his own conclusory and self-serving statements, to establish that he would not have pled guilty if he had not been restrained. Mahdi has not shown any reason for this court to doubt his representation to Judge Newman made under oath during the plea colloquy that his restraints had no bearing on his decision to plead guilty.  *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) ("[T]he representations of the defendant . . . [during the plea hearing], as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity.  The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.").  In addition, the record shows Mahdi began to consider pleading guilty before the ex parte meeting with Judge Newman, which was

---

[10]The court notes that Madhi's sentencing ultimately took place before Judge Newman, not a jury, which eliminates the risk that the jury could have inferred "that court authorities consider the offender a danger to the community."  *Deck*, 544 U.S. at 633.

[11]Moreover, as even Mahdi has admitted, Judge Newman's ruling complied with *Deck*.  (*See* ECF No. 113 at 15 ("[Judge Newman's] ruling, *if followed*, would have prevented a violation of *Deck*.") (emphasis in original)).

before he was fully restrained. Moreover, uncontested testimony from trial counsel during the PCR evidentiary hearing suggests Mahdi chose to plead guilty as a matter of trial strategy. (*See* App. A001921-23).

For these reasons, Mahdi's underlying claim of ineffective assistance of trial counsel lacks merit and Mahdi cannot excuse the procedural default of Ground One under *Martinez*. Accordingly, Mahdi is not entitled to relief on Ground One.[12]

### GROUND TWO – MITIGATING EVIDENCE

In Ground Two, Mahdi alleges his trial counsel were ineffective in failing to adequately investigate, develop, and present mitigating evidence. (ECF No. 75 at 14-29). Mahdi raised this claim in his PCR application as Ground 10(a)/11(a)(iii) (*see* App. A000236) and the PCR court addressed this claim on the merits (App. A000085-181). The PCR Order divided Mahdi's claim into five different allegations of ineffective assistance of counsel: (1) Counsel should have interviewed and called at sentencing several of Mahdi's extended family members and also community members to testify to his family, social, scholastic, and mental health history; (2) Counsel should have presented the testimony PCR counsel presented at PCR through a different forensic social worker than the one counsel used at sentencing; (3) Counsel should have introduced testimony from an expert regarding the effect of Mahdi's life of incarceration on Mahdi; (4) Counsel failed to adequately investigate, develop, and present evidence concerning Mahdi's mental health history or

---

[12]In addition, because Mahdi has failed to show his underlying ineffective assistance of trial counsel claim is substantial or to properly allege facts that, if proven, would entitle him to relief, the court denies Mahdi's request for an evidentiary hearing on this ground. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

mentality; and (5) Counsel failed to introduce certain documents at sentencing such as certain school records, Mahdi's DJJ records, records from Mahdi's commitment to the Walter Carter Center at age nine, and his father's records, and counsel failed to call school officials. (App. A000085-86).

On PCR appeal, Mahdi presented one question: Was Petitioner denied the effective assistance of counsel at his capital sentencing proceeding by trial counsel's decision to rely entirely on a single expert witness to present mitigating evidence about Petitioner's background instead of calling available lay witnesses who could have provided detailed and specific testimony in mitigation. (ECF No. 31-18 at 5). Accordingly, after a thorough review of Mahdi's petition for writ of certiorari (ECF No. 31-18), the State's return (ECF No. 31-19), and Mahdi's reply (ECF No. 31-20), the court finds the following allegation preserved and will address it under § 2254(d): trial counsel were ineffective in failing to investigate and present mitigating evidence from non-family lay witnesses.[13]

Mahdi did not raise the remaining claims in Ground Two in his PCR appeal. However, in his second PCR action, Mahdi sought to appeal this ground, as presented in his initial PCR application, pursuant to *Austin v. State*, 409 S.E.2d at 395.[14] (ECF No. 46-1 at 2-3). In finding Mahdi was not entitled to an *Austin* appeal, the second PCR court noted, "*Austin* is only applicable

---

[13]*See* Reply to Return to Petition for a Writ of Certiorari, ECF No. 31-20 at 5 ("Mahdi contends that the PCR court erred in denying his claim that available non-family members, *i.e.*, members of the community, including his former teachers, should have been called as witnesses.")

[14]In *Austin*, the state court denied petitioner's PCR application and PCR counsel failed to seek appellate review. 409 S.E.2d at 396. Petitioner filed a second application alleging only that his PCR counsel were ineffective for failing to appeal and that application was summarily dismissed. *Id.* On a petition for rehearing, the Supreme Court of South Carolina noted its previous recognition of a prisoner's right to the assistance of appellate counsel in seeking review of the denial of PCR, found petitioner sufficiently stated a claim of ineffective assistance of counsel, and remanded for an evidentiary hearing. *Id.*

where the applicant wished to appeal from the denial of PCR but was denied the opportunity to seek appellate review or the right to appellate review of a previous PCR order was not knowingly and intelligently waived." (ECF No. 66-1 at 29). Neither of those situations was present in this case, where Mahdi "already had a full round of PCR remedies," *id.* at 10, and was represented on PCR appeal by qualified counsel. Further, the court stated ineffective assistance of PCR appellate counsel was not a recognized exception allowing a petitioner to file a second or successive PCR application. *Id.* at 29. Mahdi appealed that decision to the South Carolina Supreme Court, which dismissed his appeal and denied his petition for rehearing. (*See* ECF No. 126-1 (April 19, 2018, order dismissing appeal); ECF No. 135-2 (June 27, 2018, order denying petition for rehearing); ECF No. 135-3 (June 27, 2018, remittitur)).

Although the state courts denied Mahdi's second PCR application on procedural grounds, Mahdi has fairly presented his allegations to the state's highest court and has thus technically exhausted the remaining claims in Ground Two. However, because these claims were not properly preserved, they are procedurally barred. *See Matthews v. Evatt*, 105 F.3d 907, 915 (4th Cir. 1997), *abrogated on other grounds by United States v. Barnette*, 644 F.3d 907 (4th Cir. 2011). Mahdi asserts several arguments to overcome the procedural bar, all of which the court will address after it considers the preserved portion of Ground Two.

Under *Strickland*,

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes that particular investigation unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91. Thus, counsel must conduct a reasonable investigation, thorough enough to make an informed decision regarding which mitigating evidence to present. In assessing counsel's investigation, the court "must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2009) (quoting *Strickland*, 466 U.S. at 688, 689).

Further, to establish a Sixth Amendment violation, Mahdi "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *Porter v. McCollum*, 558 U.S. 30, 41 (2009). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To assess that probability, the court must "evaluate the totality of the evidence–'both that adduced at trial, and the evidence adduced in the habeas proceeding'–and 'reweig[h] it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41(quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)).

## *Relevant Background*

### **The Evidence at Sentencing**

The State presented an extensive case in aggravation, consisting of twenty-eight witnesses and an in-person visit to the crime scene. (*See* App. A003253-3579). The trial judge heard moving victim impact evidence from Captain Myers's wife, Amy Trip Myers (App. A003271-3301); father, Edward Myers (App. A003554-3562); daughter, Meredith Myers Firestone (App. A003562-3568); and several of his former co-workers and friends at the Orangeburg Department of Public Safety,

including Lieutenant William Alexander Cartwright, III (App. A003472-3475), Captain Michael Anthony Adams (App. A003476-3484), and Chief Wendell Davis (App. A003546-3553).

In addition, the State detailed Mahdi's history of trouble with law enforcement. Sheriff James R. Woodley, from Brunswick County, Virginia, described attempting to serve a juvenile detention order on Mahdi when he was fifteen years old. (App. A003302-3311). Mahdi had been convicted of breaking and entering in Mecklenburg County, North Carolina, and had failed to appear for sentencing. (App. A003304). When Sheriff Woodley approached Mahdi's house, Mahdi and his father locked themselves inside and refused to come out for approximately eight hours. (App. A003306). When Mahdi finally came out and the police had him in custody, fifteen-year-old Mahdi stated, "I'm going to kill a cop before I die." (App. A003307).

Mahdi then spent time at the Virginia Department of Juvenile Justice ("DJJ"). Linda Lee Coulson, a counselor at the DJJ Reception and Diagnostic Center for Children, evaluated Mahdi, and testified regarding her assessment. (App. A003311-28). In addition, the State admitted Ms. Coulson's evaluation into evidence. (App. A003314 (evaluation admitted); ROA 1867-75 (Coulson Evaluation)). In her evaluation, Ms. Coulson indicated Mahdi lived with his father, who was unemployed and reportedly had a criminal record for vandalism and escape. (ROA 1869). She stated Mahdi's mother was a nurse in Richmond, Virginia, and that Mahdi had infrequent contact with her, but denied that as a source of anxiety. *Id.* Ms. Coulson reported Mahdi's brother had joined Job Corps and was pursuing vocational training. *Id.* at 1869-70. Mahdi told Ms. Coulson he was closer to his brother than to any other family member. *Id.* at 1870.

Based on her conversations with Mahdi and information provided by the court and contained in his records, Ms. Coulson found Mahdi was "the product of a dysfunctional single parent family

characterized by a lack of involvement with his mother, an absence of a positive adult role model, instability, unemployment, and a lack of structure and supervision." *Id.* She went on to note:

> While Mikal advised that he and his father have a positive relationship, it appears that his father has placed little emphasis on supervision of Mikal, and has even provided a poor adult role model for his son. Information provided by the court and by Mikal would indicate that his father has made little attempt to reinforce Mikal's receiving an education, and his father refused to comply with court requests during Mikal's court involvement. Reports note that court workers were required to have a show cause issued in order to compel his father's cooperation. While Mikal claimed that he views his family as nurturing and supportive, it appears that Mikal has not been closely involved with either parent and has not been held accountable for his behavior. Mikal advised this counselor that his father showed minimal reaction when he learned that Mikal was involved with larceny of firearms.

*Id.* When Ms. Coulson asked Mahdi to describe himself, he stated he was "a quiet person who 'is always up to something'" and denied any strengths other than "'robbing people.'" *Id.*

In addition, while discussing previous charges and an attempt to escape from police, Mahdi indicated he did not "feel all that bad about stealing" and Ms. Coulson noted he "appeared to consider that attempting to escape was to be expected." (ROA 1873). Ms. Coulson stated that, while Mahdi admitted to his crimes, he viewed his commitment as unfair and "failed to accept complete responsibility for his behavior." *Id.* Based on his comments, Ms. Coulson concluded Mahdi had "no respect for the rights and property of others," was "without remorse," had "little empathy for the impact of his behavior upon others," and "did not appear to be motivated to avoid future court involvement." *Id.* In considering a placement recommendation, Ms. Coulson noted, during his time at the reception center, Mahdi had not adjusted well, had remained self-focused, bragged about the past, and exhibited aggressive behavior toward his peers. (ROA 1875). That aggressive behavior apparently included assaulting another youth at the facility. (App. A003317-18). Ms. Coulson recommended supportive services to provide more adequate structure and supervision

after his release and a highly structured environment while in state care, "where he could address the following issues: substance abuse services, values clarification, assertiveness training, self-esteem, family services, and problem solving skills." (ROA 1873-74).

The State also admitted into evidence portions of Mahdi's DJJ running case record. (App. A003489 (records admitted); ROA 2137-85 (DJJ record) ). According to the record, Mahdi attended and participated in a weekly anger management group. (ROA 2137, 2138, 2139, 2140). However, Mahdi was expelled from the anger management group due to "aggressive and inappropriate behavior." (ROA 2141). When his counselor informed Mahdi he had been removed from the group, Mahdi threatened that if he was not released on time, he would "fuck people up and go around acting crazy." (ROA 2141). Counseling notes indicate, at some point, Mahdi was charged with attempting to assault a guard and was placed in isolation. (ROA 2139-40). He also made suicidal and homicidal threats. (ROA 2144-45). The record contains numerous references to Mahdi's refusal or inability to take responsibility for his actions. (ROA 2141 ("Mahdi stated that he is not responsible for his actions."), 2144 ("Mahdi fails to realize that he is responsible for his own actions."), 2145 ("It is this counselor's opinion that Mahdi is 'self-entitled' as he takes no responsibility for his own actions.")). The record also references concerned phone calls from Mahdi's father and grandmother. (ROA 2137, 2138, 2141-42, 2145-47). In one phone call, Mahdi's father accused the system of being prejudiced and trying to break Mahdi's spirit and stated "Virginia is full of white supremacists" (ROA 2146).

Officer Michael Koehler, with the Richmond City Police Department in Richmond, Virginia, also testified and described another incident that took place on November 23, 2000, when Mahdi was seventeen years old. (App. A003333-3346). Officer Koehler was dispatched to Mahdi's father's

house to serve a summons on Mahdi for slashing his mother's tires and to execute an outstanding detention order. (App. A003334). Mahdi got upset and Officer Koehler had to wrestle him to the ground. (App. A003335). While on the ground, Mahdi attempted to reach for another officer's gun. *Id.* Mahdi's father tried to intervene on his son's behalf and Officer Koehler had to pepper spray Mahdi and his father and use his asp baton on both to regain control of the situation. (App. A003335-36). After the officers detained him, Mahdi stated he slashed his mother's tires because she would not come to the door when he knocked, referred to her as a "crazy bitch," and said he should have killed her. (App. A003336-37). He also asked the officers to shoot him. (App. A003337).

Judge Newman also heard testimony from Moises Rivera, whom Mahdi almost stabbed to death in Richmond, Virginia, on April 17, 2001. (App. A003347-3359). Mr. Rivera was a maintenance supervisor at an apartment building in Richmond. (App. A003348-49). His supervisor asked him to see about a large group of young people behind one of the buildings. (App. A003349). On his way, he ran into Mahdi, who was looking into an apartment window. (App. A003349-50). Mr. Rivera asked Mahdi what he was doing and Mahdi jumped him. (App. A003350). Mahdi stabbed Mr. Rivera five times in the back and once in the arm and then ran away. *Id.* Rivera testified he actually died in the ambulance and had to be revived. (App. A003351). He suffered a punctured lung, had to be hospitalized for six days, and his pain and injuries kept him out of work for two months. (App. A003350-51). Mahdi was subsequently arrested and convicted of malicious wounding, a felony in Virginia. (App. A003361). He was sentenced to 180 months, with 141 months suspended, conditioned on a period of supervised probation up to fifteen years upon his release. (App. A003361-62). Mahdi was released on May 12, 2004. (App. A003362). His conditions of probation included not leaving Virginia; obeying all federal, state, and local laws; not using,

possessing, or distributing controlled substances; and not using, owning, possessing, transporting, or carrying any firearm. (App. A003363-64).

Amanda Jean Weaver, Mahdi's grandmother's next door neighbor, testified that shortly after his release, Mahdi told her he was selling marijuana. (App. A003376). Mahdi also, reportedly, asked Ms. Weaver to help him assemble a black nine millimeter handgun. (App. A003377). And, Mahdi stole Ms. Weaver's .380 semiautomatic pistol, which he eventually used in the series of crimes leading to his South Carolina conviction. (*See* App. A003379-80, A003468-72).

Judge Newman also heard testimony about the series of crimes that culminated in Captain Myers's murder and Mahdi's eventual capture in Florida. Michael S. Poe and Phillip Seats, officers in Winston-Salem, North Carolina, testified regarding their investigation of the murder of Christopher Jason Boggs, a cashier at an Exxon gas station, on July 15, 2004. (*See* App. A003443-66). A surveillance video showed Mahdi placing a forty ounce beer on the counter, shooting Mr. Boggs in the face, then getting on the counter, pointing his gun down at Mr. Boggs lying on the floor, and firing a second shot. (Test. of Michael S. Poe, App. A003447). The surveillance tape was admitted into evidence and played, in its entirety, for the court. (App. A003455-56). In addition, a fingerprint analysis and comparison expert matched the fingerprints at the scene to Mahdi's fingerprints (Test. of Phillip Seats, App. A003458-66), and a firearm analysis expert testified the gun used to kill Mr. Boggs was the same gun stolen from Ms. Weaver (Test. of Neal Morin, App. A003471).

Corey T. Pitts testified that Mahdi car-jacked him at gunpoint in downtown Columbia, South Carolina, on July 18, 2004. (App. A003406-07).

Stephen Curtis, an agent with the South Carolina State Law Enforcement Division ("SLED")

in Columbia, testified about responding to the Myers murder scene and going to Florida to process the truck Mahdi escaped in. (App. A003417-41). He described the scene and the condition of Captain Myers's body and identified crime scene photos for introduction into evidence. Dr. Janice Edwards Ross, the forensic pathology expert who performed Captain Myers's autopsy, described Captain Myers's body and gave her findings. (App. A003569-79). She testified that Captain Myers had nine gunshot wounds—three in his head, five in his chest and abdomen, and one in his hand. (App. A003573-74). Dr. Ross also found evidence that Captain Myers had been set on fire. (App. A003572).

Sargent Darren Frost, from the Satellite Beach, Florida, police department, testified about capturing Mahdi and taking him into custody. (App. A003253-3271). The police attempted to stop Mahdi for driving erratically, but he jumped out of the moving truck, dropped a fully loaded assault rifle, and fled to a nearby condominium complex. (App. A003255-64). Sargent Frost tracked Mahdi with a canine unit and, after some struggle, was able to detain him. (App. A003264-67). Once back at the station, Sargent Frost thanked Mahdi for dropping his gun and not shooting him. (App. A003270). Mahdi looked at him and said the selector was stuck on a three shot and he did not think he could shoot both officers and the dog. *Id.*

The State also presented evidence of Mahdi's behavior since his arrest. Mahdi was housed in Lee Correctional Institution in Bishopville, South Carolina, from July 2004 until June 17, 2005. On January 18, 2005, Mahdi was subject to a disciplinary hearing for striking Officer G. Tony. (Test. of Henry Lee Johnson, App. A003491-92). During the disciplinary hearing, Mahdi stated the next chance he got, he was going to "kill that mother fucking officer." (App. A003492). On February 9, 2005, officers left Mahdi alone in a conference room briefly after an interview. (Test.

of Wickliffe McPherson, App. A003497-98).  When they returned and searched the room, the officers found that the cover to a wall socket had been removed and metal pieces were missing.  (App. A003498).  Officers searched Mahdi and found he had the metal pieces.  (App. A003499).  The officers then searched Mahdi's cell and found a rope made with sheets that was about fifteen feet long.  (App. A003500).  On March 10, 2005, a routine cell search turned up a thirteen foot long rope and pieces of metal.  (Test. of Henry Lee Johnson, App. A003492-94).  And on May 6, 2005, a routine cell search revealed hidden pieces of metal.  (Test. of Terrance Prioleau, App. A003503-04).

On June 7, 2005, Mahdi submitted an inmate grievance form regarding the grievance coordinator's delayed response time.  (Test. of Janet Driggers, App. A003508-09).  The grievance form read: "I cannot be diplomatic with you people, so my last action would be to kill you.  Why not?  You're not good to anybody.  I could easily get someone to murder you.  What is wrong with you, bitch?  I bet you'll respond quick to this, won't you?  You people think this shit is a game." (App. A003509).  Mahdi was charged with threatening to inflict harm on an employee. *Id.*  At Mahdi's June 14, 2005 disciplinary hearing for this charge, he continued to threaten the grievance coordinator.  (Test. of Annie Sellers, App. A003521-22).  The hearing officer had to recess the hearing and remove Mahdi from the hearing room.  (App. A003523-24).  Even while being removed from the room and escorted down the hallway, Mahdi continued to make threats.  (App. A003524).  The State played a tape of this hearing for the court.  (App. A003523).

Mahdi was transferred to Kirkland Correctional Institution in Columbia, South Carolina, shortly after this disciplinary hearing.  Gary Lane, Captain at Kirkland, described the institution and two incidents with Mahdi.  (App. A003526-38).  Captain Lane testified that Kirkland gets the worst

of the worst inmates. (App. A003527). It is a fifty-bed maximum security institution where inmates are housed individually and are kept in full restraints and escorted by two officers at all times. *Id.* On March 29, 2006, officers discovered a hammer-like weapon in Mahdi's cell constructed of a piece of drain cover, two toothbrushes, a string from his mattress, and a paper form. (App. A003529-30). After this discovery, Captain Lane moved Mahdi to the High D Wing, where the six highest security risk inmates in Kirkland are housed, because he was concerned for his staff's safety. (App. A003528, A003531). In the High D Wing, the lights are kept on twenty four hours a day and there are cameras in every cell. (App. A003528). This is the most secure area within the South Carolina Department of Corrections ("SCDC"). (App. A003538). On May 19, 2006, Captain Lane noticed through surveillance footage that Mahdi had been spending time under an area where the televisions were kept. (App. A003531). He sent a team to Mahdi's cell and they found two pieces of metal, one sharpened to a point, and a piece of knotted rope. (App. A003533).

And, as discussed in Ground One, the trial court heard from Sheriff Thomas S. Summers, who was in charge of courthouse security for the trial, regarding Mahdi's homemade handcuff key. (App. A003538-3546). Sheriff Summers' testimony indicated Mahdi made the key while housed in High D Wing; requested Sheriff Summers switch his leg braces to leg irons, with which the key would more likely work; brought the key from his cell to the courthouse on multiple days, hidden in his mouth; and failed to use it only because courthouse security denied him the opportunity. (*See* App. A003539-43).

On cross-examination of the State's prison employee witnesses, trial counsel elicited testimony emphasizing that SCDC was well-equipped to handle each situation, finding contraband was fairly routine in a prison setting, and Mahdi had not escaped or used the contraband to hurt

anyone.  (*See*  App. A003502, A003505-06, A003534-37).

Trial counsel reinforced this idea by presenting James Aiken, an expert in prison adaptability.  (*See* App. A003580-3615).  Mr. Aiken testified that, in his expert opinion, SCDC had managed Mahdi "for several years in an adequate manner."  (App. A003593).  Regarding Mahdi's behavior and contraband infractions, Mr. Aiken said the severity of those infractions was reduced when considered in the context of the prison population and that such infractions were fairly routine in high security areas.  (App. A003592-93 ).  Mr. Aiken painted a picture of Mahdi as an immature boy with no backup in a prison full of violent predators and gangs.  (App. A003596-97). He suggested Mahdi would be victimized and possibly resort to self-mutilation or suicide.  (App. A003597).  Mr. Aiken described the force continuum available to SCDC to control Mahdi's movements or punish bad behaviors.  (App. A003598-601). Mr. Aiken concluded:

> Mr. Mahdi is an immature person that's done some terrible things in the community and as a result, he will remain in a prison environment for the rest of his life.  And that prison system can adequately manage him with the type of security, technology, rules, regulations, training, physical structures, et cetera for the remainder of his life without causing an undue risk to staff, inmates, as well as the general public.  And even if they deem it appropriate that they don't want to supervise him, there are other prison systems, such as the federal level, that can adequately manage any type of inmate.

(App. A003602)**.**

Defense counsel's only other witness was Marjorie Hammock, an expert in clinical social work, who conducted a biopsychosocial assessment.  (*See* App. A003615-39).  Ms. Hammock testified that to conduct her assessment she interviewed: Rose Burwell, Mahdi's paternal grandmother; Nathan Burwell, Mahdi's paternal uncle; Carson and Lawanda Burwell, Mahdi's

paternal uncle and aunt; Vera Mahdi, Mahdi's mother;[15] Corlis Ardis and Sophia Gee, Mahdi's

maternal aunts; and an unnamed member of the community who did not know much about Mahdi.[16]

(App. A003622-23).  In addition, Ms. Hammock reviewed a synopsis of Mahdi's school records and

a mental health report from his commitment to a mental health institution in Baltimore, Maryland.

(App. A003623).  Ms. Hammock presented her findings in a two page time line and a half page

school experience summary, both of which were admitted into evidence.  (*See* App. A003623 (time

line admitted into evidence), A003630 (school experience summary admitted into evidence),

A007543–44 (time line),[17] A007515 (school experience summary)).

Ms. Hammock testified that Mahdi's father, Shareef, was an extremely troubled child.  (App.

---

[15]Vera is also referred to as "Tilea" throughout the record.  Mahdi's father changed her name to Tilea when they married.  (App. A004188).  For ease of reference, the court will refer to her as Vera in this order.

[16]From Ms. Hammock's testimony at the sentencing and testimony from trial counsel's mitigation investigator offered at the PCR evidentiary hearing, it appears Ms. Hammock also interviewed Shareef Mahdi, Mahdi's father.  (*See* App. A001805 (trial counsel's mitigation investigator testifying she and "a social work expert" traveled to Philadelphia, where Shareef was living at the time)).

[17]The time line admitted into evidence contains the following information not included in Ms. Hammock's oral testimony: "1975 Sareef [sic] involved in a series of misdemeanors locally all said to be racially motivated"; "1988 Vera (Tilea) is taken to Lawrenceville from Richmond by Sareef [sic] who abuses her.  Nathan rescues Vera.  Mikal and Saleem witness more abuse and violence"; "8/23/92 Mikal involuntary admission in a psychiatric facility after suicide threat/gesture and Mikal hospitalized Admission DX Axis I, Major Depression with suicidal ideation, adjustment disorder, R/O Adjustment Disorder, Axis II Developmental Reading Disorder, Axis III Hx of right arm and right leg fractures"; "10/19/92 Mikel [sic] discharged from Walter P. Carter Mental Health.  Discharge DX Axis I Major Depression, Single Episode[.] Mikal also becomes more disruptive in his uncle's home in order to force his return to Lawrenceville to join his father and brother.  He has become even more defiant after he learns that his brother has joined his father.  The three reunite and live on Burwell property with the boys.  This was an isolated place in the country and they often had no food, heat or money."  The time line ends in April 2001, when Mahdi was transferred to the Virginia Department of Corrections.  (App. A007544).

A003625).  Shareef attended the local, formerly white, school shortly after desegregation and recalled being traumatized by the experience.  (App. A003626).  He was constantly in conflict with and alienated from those around him and considered himself unwanted.  *Id.*  Ms. Hammock stated there was alcoholism and neglect in Shareef's family.  *Id.*  Shareef was the only one of his siblings to not finish school; instead, he joined the Marines.  *Id.*  After he was discharged from the Marines, Shareef converted to Islam and changed his name.  (App. A003626-27).  He had odd jobs, but was not able to function well, struggled with depression, and had a number of incidents with local law enforcement.  (App. A003627).

Shareef was twenty-seven and Vera was sixteen when they had an arranged marriage.  *Id.*  Ms. Hammock described the marriage as full of conflict, very unstable, and chaotic.  *Id.*  Shareef was unable to support his family and they moved several times, eventually living with Mahdi's grandmother in Lawrenceville, Virginia.  *Id.*  Ms. Hammock testified Mahdi and his older brother, Saleem, witnessed a "great deal of conflict" between their mother and father and that, when Mahdi was four or five, Vera left the family to "get away from the abuse."  (App. A003627-28).

After Vera left, Shareef struggled to take care of the boys.  (App. A003628).  Mahdi's grandmother tried to help, but she and Shareef had a very confrontational relationship.  *Id.*  At some point, Shareef forced Vera to return to Lawrenceville from Richmond.  *Id.*  Ms. Hammock testified Vera returned "ostensibly to see the boys, but that result[ed] in, again, some physical conflict.  And she le[ft] again not to see her son for a number of years."  *Id.*

Ms. Hammock stated Mahdi had difficulty in school.  *Id.*  He was considered bright, but did not perform well, was a poor reader, and struggled with his self-esteem.  (App. A003628-29).

In 1991, Shareef sent Mahdi to live with his aunt and uncle, Carson and Lawanda Burwell,

in Baltimore, Maryland. (App. A003629). Carson and Lawanda described Mahdi as a bright and energetic young boy, but very, very troubled and indicated he had difficulty in school. *Id.* Carson told Ms. Hammock that Mahdi could not read at all when he came to live with them. *Id.*

Regarding Mahdi's education, Ms. Hammock listed the schools he attended[18] and summarized parts of his records from second and third grade. (App. A003630-32). In second grade, records indicate Mahdi had uneven skills—he was placed in an average math program, but a below average reading program—and needed improvement in his standards for behavior and showing respect for authority. (App. A003631). In third grade, Mahdi was outstanding in science, but below average in reading, vocabulary, and spelling. (App. A003631-32). The records also indicate Mahdi struggled with self-esteem and had difficulty with relationships with others. (App. A003632). Ms. Hammock also noted Mahdi's education was disrupted several times by moves and, ultimately, by his father removing Mahdi from school in order to homeschool him. *Id.*

Ms. Hammock testified Vera was very withdrawn, did not want to participate in the interview, and seemed frightened of being involved with the family again. (App. A003632-33). Vera and others described Vera's abusive relationship with Shareef, but Ms. Hammock did not relate any specifics. (*See* App. A003633). Mahdi lived with Vera for a short time when he was released

_____

[18]She testified Mahdi began kindergarten at Sister Clara Muhammad School in Richmond, Virginia, but also attended kindergarten at Totaro Elementary School in Lawrenceville, Virginia. (App. A003630-31). She stated records were not available, or were not legible, from Sister Clara and there were not narrative records from Totaro. (App. A003631). Mahdi then started first grade at Chamberlayne Elementary School in Richmond, Virginia. *Id.* Ms. Hammock stated records were not available from Chamberlayne either. *Id.* Then, Mahdi was sent to Baltimore, Maryland, where he attended Scotts Branch Elementary for second and third grade. *Id.* According to the school experience summary, Mahdi attended Totaro Elementary for fourth grade and part of fifth grade, until Shareef removed him in order to homeschool him. (App. A007515). The experience summary also indicates Mahdi did not appear motivated in fourth grade and his potential was stifled. *Id.*

42

from DJJ.  Ms. Hammock described this as "not a good reunion," said Vera and Mahdi "did not get along at all," and Vera said she and Mahdi "had very different kinds of ideas about his living with her."  (App. A003634).

Ms. Hammock testified Mahdi's child development was greatly impacted by his father's inability to properly parent.  (App. A003635).  Mahdi's childhood was marked by conflict, chaos, and a lack of stability.  (App. A003636-37).  During adolescence, Mahdi was exposed to his father's outbursts and problems, including his conflicts with his own family, the community, and law enforcement.  (App. A003637).  She stated that more than anything, Mahdi wanted an intact family and an ongoing relationship, but he never received consistent help from his mother or father in growing up and developing good skills and a sense of values. *Id.*  Ms. Hammock opined Mahdi had suffered emotional trauma throughout his early life, which "had an impact on his inability to make good choices, to have a good sense of himself and others and to behave according to societal norms." (App. A003638).  She stated Mahdi had the following risk factors: abuse and neglect; abandonment; lack of proper socialization; poor self-esteem; poor history of school progress; and poor sense of himself. *Id.*

Ms. Hammock concluded:

[S]omeone who is neglected, was abandoned, who suffers from poor parenting is likely to end up in a situation where he's out of control and he does damage to himself and others.  This is - - we find this profile all too frequently in people who end up in this kind of situation.  He never had really a chance to develop appropriately.

(App. A003638-39).

In addition to these two witnesses, it appears trial counsel intended to call Mahdi's grandmother, who was present in the courtroom, but, after speaking with her during a break, counsel

did not call her and, instead, rested.  (*See* App. A003639).

## The Sentencing Order

Judge Newman read his twelve page sentencing order into the record.  (*See* App. A003686-3702).  After reciting the facts, Judge Newman found the State had proven the existence of two aggravating circumstances beyond a reasonable doubt, thus allowing him to consider the death penalty.  (App. A003691).   Judge Newman then considered the nonstatutory aggravating circumstance of Mahdi's prior and subsequent bad acts, which were "relevant to show his bad character, evil nature, and malignant heart," and found the State had established Mahdi's bad character and propensities by clear and convincing evidence.  (App. A003692-95).  Judge Newman considered the mitigating circumstances argued by the defense and any mitigating circumstances supported by the evidence, including Mahdi's youth, "turbulent and transient childhood and upbringing," prison adaptability, and acceptance of responsibility through pleading guilty.  (App. A003695-99).  Judge Newman found none of these mitigating circumstances deserving of significant weight.  (App. A003696-99).   Judge Newman also considered victim impact evidence.  (App. A003699).

In sentencing Mahdi to death, Judge Newman stated:

My challenge and my commitment throughout my judicial career has been to temper justice with mercy and to seek to find the humanity in every defendant that I sentence.  That sense of humanity seems not to exist in Mikal Deen Mahdi.

. . . .

Today, the defendant also seeks mercy, the same mercy that perhaps Captain James E. Myers sought for an instant before Mikal Deen Mahdi fired nine bullets into Captain Myers' body from one of Captain Myers' prized weapons before setting his body on fire with matches and diesel fuel belonging to Captain Myers.   In extinguishing the life, hope and dreams of Captain Myers in such a wicked, depraved

and consciousless manner, the defendant, Mikal Deen Mahdi, also extinguished any justifiable claim to receive the mercy he seeks from this Court.

(App. A003700-01).

## The Evidence at PCR

Mahdi's PCR counsel presented an extensive and thorough account of Mahdi's background, including his family history, upbringing, mental health, and incarcerations. Counsel presented five family members. Carson Burwell, Mahdi's paternal uncle, and his wife, Lawanda Burwell, provided insight into Mahdi's time spent in Brunswick County, Virginia, and Lawrenceville in particular. (*See* App. A001260-61, A001481). They testified regarding the Burwell family's background and history, including their racial views and family tensions. (*See* App. A001262-66, A001269-70, A001484-85, A001487-89). Carson described his upbringing and how he and Shareef related to their parents, how Shareef changed after attending a desegregated school, Shareef's marriage to Vera, and Shareef's parenting of Mahdi and Saleem. (*See* App. A001267-82). Both also testified regarding the period of time when Mahdi lived with them in Baltimore, Maryland. (*See* App. A001282-92, A001494-1513). Lawanda, who has a doctorate in maternal child health from the Harvard School of Public Health, described Mahdi's emotional issues around learning and how they were attempting to overcome the gaps in his education. (*See* App. A001499-1503).

Both Lawanda and Carson recounted Mahdi's abuse allegation against Lawanda in August 1992 when he was approximately ten years old. (App. A001286-92, A001503-08). After a spanking from Lawanda, Mahdi put soot from the fireplace and ketchup on himself to give the appearance of severe injuries and called the police. At some point, Mahdi asked one of the responding officers for his gun so he could shoot himself and was immediately taken to the Walter Carter Center, a mental

health facility, where he was admitted for around sixty days. After Mahdi was released, Carson and Lawanda continued to take him to counseling for several months, but he would not participate in the therapy and seemed to be doing well at that time, so they stopped. Lawanda testified at the end of third grade, Mahdi was in a good place. (App. A001508). But, that summer, Mahdi discovered Saleem had moved back in with Shareef and he wanted to be with his father and brother, so he began acting out again. When Mahdi returned to Lawrenceville to live with his father, Shareef was not in any better condition to take care of the boys than he had been when Carson took Mahdi and sent Saleem to Texas. (App. A001514). Carson did not recall ever being interviewed by Mahdi's defense team and stated he definitely would have testified had he been asked. (App. A001294-95). Lawanda remembered being interviewed by Ms. Hammock and Paige Tarr, the defense team's mitigation investigator, but she was not asked to testify. (App. A001514). She stated she was not sure she would have agreed to testify if they had asked, but maybe she could have been convinced. (App. A001515).

Sandra Wynn Burwell, who was married to Mahdi's uncle, Nathan Burwell, Jr., from 1972 to 1983, and grew up in Brunswick County, provided an affidavit. Her affidavit also discussed the Burwell family, Shareef's background, and Shareef's relationship with Vera. (App. A004154-55). She provided more information on Vera and the end of Shareef and Vera's relationship. (App. A004155). According to Sandra, while living with Shareef and raising the boys, Vera managed to get her GED and complete a nursing program at a junior college. *Id.* She then convinced Shareef, who was unemployed, that she should join the military. *Id.* When she returned home from the military, she informed Shareef she wanted a divorce and was taking the boys. *Id.* Shareef would not allow that and Vera left without her sons. Shareef repeatedly told Mahdi and Saleem their mother

abandoned them and did not love them. *Id.* Sandra attended the hearing when Mahdi was first sent to DJJ after the stand-off with police. *Id.* She stated the failure to report was not Mahdi's fault, Shareef would not let her visit Mahdi in jail, and she felt so sorry for Mahdi that she considered adopting him. *Id.*

Mahdi's maternal aunts, Rose M. Gupton and Sophia A. Gee, testified regarding Vera's childhood, background, relationship with Shareef, and what she was like as a mother. (*See* Rose M. Gupton Test., App. A001316-30; Sophia A. Gee Test., App. A001331-47). In addition, when Mahdi was a teenager, he would periodically come by Sophia's house. (App. A001339). She stated Mahdi was always nice to her and was "a loving, respectable, typical teenager." *Id.* Rose stated nobody from the defense team ever contacted her and she did not know Mahdi had been arrested for murder until he was convicted. (App. A001327-28). Rose indicated she would have testified at Mahdi's sentencing if asked because he deserved mercy and never had a chance. (App. A001328). Sophia, and her sister, Corliss, were interviewed by the defense team. (App. A001341-42). However, the defense team did not ask Sophia how to get in touch with other family members or to testify on Mahdi's behalf. (App. A001342-43). Sophia said she would have testified if asked because Mahdi's parents failed him from the beginning. (App. A001343).

In addition, PCR counsel presented evidence from seven community witnesses, including three of Mahdi's teachers. In third grade, after he was released from the Walter Carter Center, Mahdi's school placed him in Myra R. Harris's class. (App. A001348-49). Ms. Harris testified her class contained the troubled kids, or the kids who had not been successful in other classrooms. (App. A001349-50). She said, initially, Mahdi was withdrawn and not friendly, but she was able to draw him out by listening to him and giving him a voice. (App. A001351-52). He had some discipline

problems in other classrooms, but not in hers. (App. A001351). He had a lot of trouble with homework and struggled with change and transitions. (App. A001354-55). By the end of the school year, Mahdi would give Ms. Harris hugs, was smiling, had some friends, and was just like the rest of the kids. (App. A001353, 1356). He had performed well academically and even received two awards: outstanding achievement in art and a certificate for academic achievement. (App. A001358-59). Ms. Harris did not know Mahdi had been sentenced to death until she was contacted by PCR counsel. (App. A001359). She stated she would have testified at his sentencing if asked. (App. A001360).

For most of fourth grade, Mahdi returned to Totaro Elementary School in Lawrenceville, where Dora G. Wynn was the principal. Ms. Wynn submitted an affidavit and stated Mahdi had emotional difficulties, was frequently brought to her office, was withdrawn, had trust issues, refused to do his work or eat, and would, on occasion, simply walk away from school. (App. A004146). During his fourth grade year, Mahdi was recommended for placement in special education. *Id.*

Carol E. Wilson was chair of the child study team that evaluated Mahdi for special education placement and also Mahdi's fifth grade teacher. (App. A001367-68). Ms. Wilson testified that, in order to assess Mahdi's eligibility for special education, a team conducted a full child study, including a psychological evaluation, educational diagnostics, recommendation from a guidance counselor, and classroom observations. (App. A001368). After the assessments were complete, the team held an eligibility meeting to discuss their findings. (App. A001370-71). Ms. Wilson recalled Shareef attended that meeting, but cursed at everyone and stormed out when Mr. Vecker began reading his psychological findings. (App. A001371). Mr. Vecker was Caucasian and Shareef said he did not want any white man writing negative reports about his son. *Id.*

Ms. Wilson reviewed each section of the report from the assessment meeting.  On the Burks Rating Scale, a behavior assessment, Mahdi scored "very significant [with] excessive self-blame, poor impulse control, and excessive resistance."  (App. A001373).  He also exhibited periods of extreme sadness.  (App. A001373).  Ms. Wilson concluded that he appeared to be unable to cope with his self-esteem problems and that made Mahdi unable to function and effectively learn in school.  (App. A001373-74).  On the medical portion, Mahdi was noted to be overweight and anemic.  (App. A001374-75).  Psychologically, Mahdi had a full scale IQ of 118, but testing showed psychological blocking and characteristics of children who present academic problems, particularly in language arts.  (App. A001375).  Mr. Vecker found Mahdi's projectives revealed depressive and victimization themes, feelings of helplessness, withdrawal, denial, and lack of self-esteem.  (App. A001375-76).  Ultimately, the team found Mahdi eligible for the emotionally disabled program and recommended he continue counseling and  receive assistance in reading.  (App. A001379).

Shareef eventually signed Mahdi's individual education program and Mahdi entered Ms. Wilson's special education class in fifth grade.  (App. A001381).  Ms. Wilson recalled Mahdi was never disrespectful, but was depressed and very sad.  (App. A001382).  He liked to draw and would draw black and white pictures of people hanging.  (App. A001383).  Ms. Wilson described Mahdi as flat and lacking in joy, interest, or motivation.  (App. A001384).  He was quiet and had little interaction with other students, but he was not a behavior problem.  *Id.*

While Mahdi was in the fourth and fifth grades, Shareef was working as a substitute teacher in the Brunswick County school system.  (*See* App. A001383; Wynn Aff., App. A004146).  While substituting in a fifth grade class, Shareef told the girls to get fitted for birth control, use condoms, and to not have illegitimate children or get on welfare.  (App. A001386).  The school system fired

Shareef and he withdrew Mahdi, supposedly to homeschool him. *Id.* After that, Mahdi "fell through the cracks." *Id.*

When asked if she was surprised Mahdi had been charged with murder, Ms. Wilson responded, "with everything the way that it was going and with his father, I couldn't expect anything else." (App. A001387). She testified that she was never contacted by trial counsel, but would have testified and asked the judge for mercy if given the chance. (App. A001388).

The remainder of the community witness testimony focused on Shareef. George R. Smith, who managed the blacks-only swimming pool in Lawrenceville for a time, remembered Shareef bringing Saleem and Mahdi to the pool almost every day when the boys were young. (App. A001408). Shareef was clean-cut at the time and there was nothing particularly remarkable about him and the boys. (App. A001408-09). Then, in the 1980s, Mr. Smith won a voting rights case against Brunswick County and became known as a civil rights activist. (App. A001409). After that, Shareef admired Mr. Smith and would periodically contact him. *Id.* Mr. Smith testified Shareef hated white people "with a passion" and recalled him speaking approvingly of Hitler killing "those Jews." (App. A001410). Mr. Smith did not think Shareef had a job and believed Mahdi's grandmother was supporting the boys. (App. A001411-12).

Mr. Smith also described an incident where Shareef jumped into the whites-only swimming pool and refused to get out. (App. A001412-15). The sheriff's office called Mr. Smith to assist and he drove to the pool. (App. A001412). When he arrived, Shareef was swimming around, using vile language, and talking about why O.J. Simpson had killed Nicole Brown Simpson. (App. A001412-13). Shareef eventually agreed to come out of the pool, but only if Mr. Smith walked between him and the officers the 100 yards to the sheriff's office. (App. A001414). Mr. Smith and the officers

agreed, and everyone walked to the sheriff's office, which is also where the jail was located. (App. A001414-15). Mr. Smith went into the cell with Shareef. (App. A0014150). According to Mr. Smith, once Shareef was locked in the cell, "he just went wild," throwing chairs against the wall and breaking tables. *Id.* Mr. Smith said it was "just as violent as anything [he] ha[d] ever seen in [his] life," and he left. *Id.*

Mr. Smith also accompanied Shareef to Mahdi's hearing after the stand-off with police. (App. A001416). He remembered the judge commenting that Mahdi was a smart kid and his problem was his father. (App. A001417). The defense team did not contact Mr. Smith. (App. A001415). He stated that if asked, he would have testified and probably would have asked the judge for mercy because of the "rampant rumors about what was going on in that household." (A001415-16).

Sharon C. Pond, a psychologist at Brunswick Behavioral Health Center, testified regarding any records she could find related to Mahdi and Shareef.[19] (App. A001419-23). Mahdi's intake was on February 24, 1994, and his case was closed on September 14, 1994. (App. A001420). Shareef was seen as a mental health outpatient on March 4, 1994, discharged on May 16, 1994, seen for emergency services on July 9, 1994, and his case was closed on September 1, 1994. (App. A001421). Ms. Pond did not have a clear personal recollection of Shareef, but would have directly supervised whomever worked with him. (App. A001422). She testified that, after the pool incident, the sheriff's office called one of her emergency workers to assess Shareef. (App. A001422-23). The emergency worker found Shareef had a mental illness and was imminently dangerous to himself or

---

[19]The detailed records had been purged due to age, so she only had "face sheets" with each person's personal data and dates and circumstances of contact. (*See* App. A001419-20).

others. (*See* App. A001423). That assessment resulted in Shareef's involuntary commitment to Central State Hospital Forensic Unit. *Id.*

Ms. Pond stated Nancy Burwell, Mahdi's grandmother, was on the community services board of the Brunswick Behavioral Health Center at the time of Shareef's commitment. (App. A001423). Nancy spoke with Ms. Pond regarding Shareef's problems and blamed herself for involving him in the movement to integrate the public schools. (App. A001423-24). Nancy felt, although it was the right thing to do civically and morally, it was the absolute wrong thing to do for Shareef and the experience left him very damaged and hurt. *Id.* Mahdi's defense team did not contact Ms. Pond. (App. A001424).

Douglas R. Pond, Ms. Pond's husband, current mayor of Lawrenceville, and former chief of police, also submitted an affidavit. (App. A004148). Mr. Pond grew up with Shareef and remembered him as a fairly normal child. *Id.* However, Mr. Pond stated that after his conversion to Islam, Shareef became eccentric and radicalized. *Id.* Shareef did not like white people and there was a racial overtone to his statements and actions. *Id.* Mr. Pond was the chief of police at the time of the pool incident and remembered Shareef saying things like "come on, white boy," when officers would ask him to get out of the pool. *Id.* Mr. Pond also stated he knew Nancy Burwell from the community and that she had always been "eccentric and somewhat goofy" and routinely got confused about when her water bill was due. *Id.* Mahdi's defense team did not contact Mr. Pond, but he stated he would have been willing to testify or provide the above information. *Id.*

Finally, James R. Woodley, former Sheriff of Brunswick County, who testified for the State during Mahdi's sentencing, provided an affidavit on Mahdi's behalf in his PCR proceeding. (App. A004149-51). Mr. Woodley grew up with the Burwells and, while he did not know Shareef as well

as the older children, he remembered him as easy going and relatively normal until he began attending an integrated school. (App. A004149). Mr. Woodley described Nancy Burwell as someone with "all the lights [] on, but nobody's home." *Id.* He indicated Shareef had always seemed dominant and domineering and had no respect for women. *Id.* Mr. Woodley testified that he remembered one time Nancy told him that Shareef had beaten her with a belt buckle while Saleem and Mahdi watched. *Id.* Nancy wanted Shareef to get help, so Mr. Woodley arrested him and referred him for mental health treatment. *Id.* After the mental health evaluation, Shareef returned to jail, where no charges were filed because Nancy would not testify. (App. A004149-50).

Mr. Woodley also filled in details about what happened when Shareef attempted to force Vera to return to Lawrenceville. (App. A004150). Shareef took Saleem and Mahdi to visit their mother, told Vera they would all go get ice cream, and, once she was in the truck, told her he was taking her back to Lawrenceville to kill her. *Id.* When they returned to Lawrenceville, the boys went into the house with Nancy and another female relative and Shareef and Vera remained outside. *Id.* Nancy and the boys heard screaming and ran outside to see Shareef trying to kill Vera. *Id.* Vera managed to escape, but later declined to press charges, saying she wanted to put the incident, Shareef, and the boys behind her. *Id.*

Mr. Woodley recalled incidents where Shareef threw a brick at his sister, Kathy, and damaged his sister Loretta's car. *Id.* He stated he personally complained to the Brunswick County Department of Social Services and the school board when he realized Shareef was not actually homeschooling the boys, but nothing ever came of it. *Id.* And finally, Mr. Woodley described Shareef's standoff with police in connection with the public pool incident and attached a related article from the local paper. (App. A004150-51). He indicated Mahdi's defense team did not

53

interview him and he was surprised Nancy was the only family member present at the trial. (App. A004151).

PCR counsel also called four experts: Dr. Nicholas C. Cooper-Lewter, Dr. Craig Haney, Dr. DeRosset Myers, Jr., and Dr. Donna M. Schwartz-Watts. Dr. Cooper-Lewter, an expert in clinical social work and psycho-social assessment, performed a new psycho-social assessment. (App. A001426-77, 1537-92). Dr. Cooper-Lewter's testimony followed the same format as Ms. Hammock's, but illuminated in greater detail Mahdi's childhood, traumas, education, mental health, and general history, which had been provided by the other PCR witnesses.

Dr. Haney, an expert in social psychology, testified regarding the likely effects on Mahdi of his extensive time in prisons. (App. A001592-1655). Based on his review of Mahdi's records, Dr. Haney testified that Mahdi "was institutionalized for approximately eight and a half out of every 10 days of his life after the age of 14," amounting to about eighty-six percent of his life. (App. A001608). Dr. Haney described similar risk factors in DJJ to those Mahdi experienced in his early life, including: abandonment, neglect, witnessing violence, instability, and unpredictability. (App. A001609). He indicated that, in order to avoid victimization in an institution, people who have been hurt by these experiences will project or develop a tough, angry exterior. (App. A001610). Dr. Haney attributed Mahdi's "maladaptive" and "impulsive" behavior in DJJ to this form of self-preservation (App. A001611-12) and opined Mahdi left DJJ "with the same problems arguably worsened by the fact that he had been in this institutional setting and had developed in part as a way of trying to adjust in this setting an even more defiant and oppositional approach to conflict and to interactions" (App. A001618).

Regarding Mahdi's time in adult prison in Virginia, Dr. Haney testified that the prison system

54

failed to address Mahdi's underlying psychological problems. (App. A001620). Dr. Haney stated untreated underlying psychological problems can often lead inmates to rack up disciplinary infractions for minor irrational and impulsive behaviors, and those infractions result in time in isolation or a transfer to a super-max facility. (App. A001621). Dr. Haney described studies suggesting prisoners subjected to extended solitary confinement can experience anxiety and mental deterioration and "lose their ability to initiate behavior or make responsible judgments about their own behavior." (App. A001623-24). In addition, Dr. Haney stated "[i]f a prisoner suffers from depression that depression almost certainly will deepen inside a super-max prison." (App. A001624). And the frustrating nature of the environment and lack of "pro-social avenues for the release of that frustration" can lead prisoners in super-max facilities to lash our impulsively and irrationally. (App. A001624-25). Dr. Haney opined these factors significantly contributed to Mahdi's institutional behavior and that, after his time at the super-max facility in Virginia, without a transitional process or psychiatric treatment, Mahdi would have had a very difficult time reentering free society. (App. A001630-33).

Dr. Myers, an expert in child and adolescent psychology, assessed developmental issues in the first sixteen to seventeen years of Mahdi's life. (App. A001656-97). Dr. Myers reviewed Mahdi's records and portions of the trial transcript and found Mahdi suffered from major depression and severe attachment disorder in his childhood and adolescence. (App. A001659-60). In discussing Mahdi's records from the Walter Carter Center, Dr. Myers noted it was very unusual for a nine year old to be admitted to a psychiatric ward and rare for someone that young to receive a diagnosis of major depression. (App. A001665-66, 1668). Dr. Myers testified Mahdi's Walter Carter Center records, special education eligibility assessment, and DJJ psychological evaluation consistently

suggested Mahdi's oppositional behavior stemmed from his major depression. (*See* App. A001682, A001684, A001690-91). He noted that a number of people along the way recognized that Mahdi needed help and made cogent recommendations, but Mahdi never received the ongoing support he needed. (App. A001691-92).

Dr. Schwartz-Watts, a forensic psychiatrist, evaluated Mahdi and diagnosed him with: (1) major depression, recurrent, with psychotic features, in remission; (2) anxiety disorder; (3) reactive attachment disorder of childhood, inhibited type; (4) paranoid personality disorder; and (5) antisocial personality disorder. (App. A001700). Dr. Schwartz-Watts opined that Mahdi's depression could have manifested as aggression and irritability (App. A001701-02) and linked her diagnoses of depression and antisocial personality disorder (App. A001705-06). In her report, Dr. Schwartz-Watts concluded Mahdi's age and mentality at the time of the crime were mitigating factors, based on the fact that he was twenty-one when he committed the crime and documentation suggesting his emotional immaturity. (App. A006972). However, at the evidentiary hearing, she testified that despite the presence of mental illnesses, Mahdi's capacity was not diminished at the time of the crime, he was able to know right from wrong, and she did not believe his mentality supported a statutory mitigating circumstance. (App. A001713-14). However, she stated his anxiety disorder could have contributed to his decision to shoot Captain Myers. (App. A001714). Dr. Schwartz-Watts also testified that Mahdi expressed remorse to her, indicating: "he said it was unnecessary to kill the man and he felt very badly about it and the other thing that he said [was that] killing someone is selfish and it shows a lack of discipline." (App. A001715).

The State then presented testimony from Mahdi's trial attorneys and defense team, which included: James Gordon, the private investigator (App. A001742-47); Paige M. Haas, the mitigation

56

investigator (App. A001800-26); Dr. Thomas V. Martin, the forensic psychiatrist (App. A001747-84); and Dr. Geoffrey R. McKee, the forensic psychologist (App. A001784-1800). The attorneys and investigators testified regarding the investigation, sharing information in periodic team meetings, consulting with the attorneys assigned to Mahdi's North Carolina murder case, and personal interactions with uncooperative family members and potential witnesses. Dr. Martin discussed his findings that Mahdi had a violent outlook, expressed no remorse, and was manipulative. (App. A001755-56).[20] Those findings led Dr. Martin to diagnose Mahdi with antisocial personality disorder. (App. A001756) Dr. McKee agreed and diagnosed Mahdi with antisocial personality disorder with a history of alcohol abuse. (App. A001790). Both doctors indicated none of the information they heard or reviewed during the evidentiary hearing would have changed their opinions and, in fact, the DJJ records, which they had not previously reviewed, were consistent with their diagnoses. (App. A001783-84, A001799-1800).

*Analysis*

**Non-Family Lay Witnesses**

In this preserved portion of Ground Two, Mahdi asserts his trial counsel were ineffective in failing to contact and present evidence from community lay witnesses, specifically: Mahdi's teachers, Myra Harris and Carol Wilson; elementary school principal, Dora Wynn; and community members who knew the Burwell family—George Smith, Sharon Pond, James Woodley, and Douglas Pond. To succeed on this claim, Mahdi must show that the PCR court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," as determined by the

---

[20]Mahdi told Dr. Martin that his actions were "justified" and that "people only understand force." (App. A001761).

United States Supreme Court, 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence" before it, 28 U.S.C. § 2254(d)(2).

In reaching its conclusions, the PCR court applied *Strickland*, *Wiggins v. Smith*, 539 U.S. 510 (2003), *Rompilla v. Beard*, 545 U.S. 374 (2005), their progeny, and their South Carolina state law equivalents. (*See* App. A000086-90, A000166-67). The PCR court found Mahdi had "not shown that counsel was deficient in failing to investigate, develop, or present mitigation evidence from his family members or community witnesses" and that trial counsel "conducted a reasonable and thorough mitigation investigation and presented what mitigation they could that was favorable to Mahdi at the time of the sentencing proceeding." (App. A000118). The court concluded "Mahdi ha[d] failed to demonstrate deficient performance here because much, if not all, of the evidence Mahdi offered at PCR regarding his family and social history, whether through family or community witnesses, was cumulative to the evidence presented in Mahdi's capital sentencing proceeding." (App. A000114, A000165 (specifically noting Judge Newman knew all the pertinent information about Mahdi's father)). And, the PCR Order included a specific finding that trial counsel were not ineffective for not calling elementary school officials. (App. A000154).

After a thorough review of the aggravating and mitigating evidence (App. A000166-81), the PCR court also found Mahdi had failed to prove prejudice (App. A000181). Given the "horrible facts of the murder" and the "overwhelming" evidence of Mahdi's bad character, characteristics, prison misconduct, and propensities for violence, the PCR court found there was "no reasonable probability Judge Newman would have returned with a different sentence" if presented with the additional mitigating evidence at PCR. (App. A000166, A000167).

Mahdi alleges two specific errors regarding the PCR court's determination: (1) the PCR court

erred by rejecting the application of the *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (2003) ("ABA Guidelines") and (2) the PCR court erred in finding the mitigation evidence offered in PCR was cumulative to the evidence offered at sentencing.[21]  (ECF No. 113 at 39 n.13, 43-45).  The ABA Guidelines state that: "capital counsel must investigate a client's social history; locate and interview all potential witnesses; locate available and relevant records; and investigate and rebut the Government's evidence in aggravation," and that "[b]ecause the sentencer in a capital case must consider in mitigation, anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant, penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."  (ECF No. 113 at 39) (citing ABA Guidelines 10.7 and 10.11 and 10.6 Commentary).

In the PCR court's original order, in addition to applicable case law, the court considered the ABA Guidelines in assessing reasonable performance. (*See* App. A000039-45).  Under this analysis,

---

[21]Mahdi also alleges the following errors in the PCR Order: (1) the PCR court erred in finding trial counsel made a reasonable strategic decision not to present certain mitigating evidence in order to avoid the admission of additional evidence in aggravation and (2) the PCR court made erroneous credibility determinations.  (ECF No. 113 at 39, 42).  However, the PCR court's finding that trial counsel made an objectively reasonable strategic decision pertained to counsel's decision not to call Mahdi's family members as mitigation witnesses, specifically Carson Burwell, Lawanda Burwell, and Sophia Gee.  (*See* App. A000115-17).  Accordingly, the propriety of that finding is not relevant to this portion of Ground Two.  In addition, it does not appear the PCR court made specific credibility determinations regarding the non-family lay witnesses.  (*See* App. A000110-14 (finding: witnesses' present statements about previous willingness to testify not credible; Mahdi's aunts and uncles were not willing to come to South Carolina and testify on Mahdi's behalf in 2006; the record showed Mahdi had engaged in conduct within his own family which would have caused, and did cause, family members to be reluctant to assist him in his mitigation case; and counsel and the defense team attempted to develop live mitigation evidence from Mahdi's family, but were met with reluctance, refusal, or inability to testify in a helpful manner)).  Thus, the PCR court's credibility findings do not directly impact the court's consideration of this portion of Ground Two.

the PCR court found trial counsel deficient for failing to interview potential witnesses outside of Mahdi's family.  (App. A000047).  However, given the aggravating circumstances in this case, the court found Mahdi had failed to show prejudice.  *Id.*

In the amended PCR Order, the PCR court carefully and expressly reconsidered the applicability of the ABA Guidelines.  (*See* App. A000087-90).  Notably, the PCR court did not find the guidelines inapplicable or irrelevant, but cited case law indicating the ABA Guidelines are just that—guidelines—and reiterating the ultimate deficiency determination turns on the much broader concept of reasonableness.  (*See* App. A000088-89) (citing *Bobby v. Van Hook*, 558 U.S. 4 (2009); *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011)).  While the United States Supreme Court has looked to the ABA Guidelines in analyzing attorney performance under similar circumstances,[22] there is no requirement that courts are bound to follow the ABA Guidelines or must grant the guidelines any weight.  *See Van Hook*, 558 U.S. at 7-8.  As Justice Alito noted in his concurring opinion in *Van Hook*, the ABA is a private group with limited membership, and "[i]t is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution," and there is therefore "no reason why the ABA Guidelines should be given a privileged position in making that determination."  *Van Hook*, 558 U.S. at 13 (Alito, J. concurring).  Thus, the PCR court's decision not to base its analysis on the advisory ABA guidelines was not contrary to clearly established federal law.

In support of his argument that the PCR court erred in finding the PCR evidence cumulative of the sentencing evidence, Mahdi asserts: (1) even if the information was the same, receiving the information through family and lay-witness first-hand accounts is more impactful than through

---

[22]*See, e.g, Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 510; *Rompilla*, 545 U.S. at 387.

expert testimony; (2) the information presented at the PCR proceedings was not cumulative; and (3) the inclusion of testimony from school teachers and community members during the PCR proceedings succeeded in humanizing Mahdi, something Judge Newman specifically found the presentation at sentencing had failed to do. (ECF No. 113 at 43-45).

First, this preserved portion of Ground Two only concerns counsel's alleged failure to develop and present evidence from non-family lay witnesses and does not address the decision to present mitigating evidence through an expert, rather than a series of character witnesses. Accordingly, the court declines to dive into a discussion of best practices in capital sentencing, at least at this point.

Second, the court has thoroughly reviewed the testimony and exhibits offered at sentencing and in the PCR proceedings and finds the PCR court's determination that the PCR evidence was cumulative is not unreasonable. While the PCR evidence certainly expanded on and added depth to Ms. Hammock's testimony and the other evidence offered at sentencing, it would not have significantly "altered the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. at 700. As discussed above, the school and community PCR witnesses testified about Mahdi's behavior and performance in school; special education evaluation; father's background, racial views, mental health, and incidents of violence against other family members and racial protests; and grandmother Nancy Burwell's occasionally off-kilter behavior.

At sentencing, Ms. Hammock testified regarding Mahdi's education, noting that Mahdi's education was disrupted several times, he had trouble reading, he suffered from poor self-esteem, and he struggled to relate to others. (App. A003630-32). Ms. Hammock's School Experience

Summary indicated Mahdi attended special reading classes and qualified for Chapter 1[23] while in school in Baltimore. (App. A007515). In addition, Ms. Hammock's School Experience Summary noted that, in fifth grade, Mahdi's father "removed [him] in order to home school." *Id.*[24] Ms. Hammock also noted, in third grade, Mahdi was outstanding in science and worked well in small groups. *Id.* Overall, though concise and lacking the detail presented at the PCR hearing, Judge Newman had before him the same basic information presented by Mahdi's teachers.[25]

In addition, while Ms. Hammock's description of Shareef's background was brief, she did note the trauma he experienced while attending a desegregated school, his depression, a number of incidents with local law enforcement, and his physical abuse of Vera. (App. A003625-28). The time line admitted into evidence reinforced Ms. Hammock's testimony and provided additional details. (*See* App. A007543-44). The time line revealed that Shareef was described as a disturbed young child, that his mother was not emotionally available to him, and that he was involved in incidents

---

[23]This refers to Chapter 1 of the Educational Consolidation Improvement Act, which provided federal funding for supplementary programs in basic skills for low-income students who qualified based on achievement.

[24]The following sentence is incomplete, but states, "There was no information that this schooling had." (App. A007515). Through the benefit of hindsight, the court assumes Ms. Hammock meant to state there was no information that Shareef ever actually homeschooled Mahdi.

[25]One notable exception is Mahdi's special education evaluation. The evaluation, detailed by Carol Wilson during the PCR evidentiary hearing, was not discussed at trial. Based on evidence at PCR, it is questionable whether trial counsel had seen the evaluation. However, trial counsel's mitigation investigator testified her common practice was to request records from every school a defendant attended and pass those records on to counsel. (App. A001803). She also testified that, in this case, she summarized Mahdi's school records and presented relevant information to counsel and other experts during their periodic team meetings. (App. A001813, A001825-26). Notably, counsel's possession of the special education evaluation is not specifically contested in the briefs, is not covered by this portion of Ground Two, and is not material to the court's evaluation of Mahdi's claims.

with law enforcement, which were "said to be racially motivated." (App. A007543). The time line also described Shareef kidnapping Vera and physically abusing her in front of Mahdi and Saleem and stated Shareef attacked his mother, Nancy. (App. A007543-44). In addition, Ms. Coulson's DJJ evaluation, which the State admitted into evidence during the sentencing phase, described Shareef as a poor adult role model and attributed much of Mahdi's apparent behavioral problems to Shareef's dysfunctional parenting. (ROA 1870). And the portion of Mahdi's DJJ records the State admitted into evidence references Shareef's statement that "Virginia is full of white supremacists." (ROA 2146). Thus, while trial counsel's mitigation presentation was brief, the court cannot find unreasonable the PCR court's determination that the evidence at PCR on these topics was cumulative.

In addition, the record suggests trial counsel considered calling Nancy Burwell to testify during sentencing. (*See* App. A003639, A001859-60). Counsel could, quite reasonably, have decided not to present information suggesting this character witness had some quirks. The decisions concerning the calling of witnesses are matters of strategy left to the attorney, which ordinarily cannot constitute ineffective assistance. *Jones v. Barnes*, 463 U.S. 745, 808 (1983).

Further, to Mahdi's broad challenge to the PCR court's finding that trial counsel conducted a reasonable investigation, despite not interviewing the teachers and community witnesses presented at PCR, the court does not find that decision contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.

The record shows trial counsel assembled a team of qualified experts to assist in Mahdi's defense and specifically to investigate potential mitigating evidence. Members of the team traveled to Lawrenceville, Virginia; Richmond, Virginia; Baltimore, Maryland; and Philadelphia,

Pennsylvania.  (App. A001805-06).  They interviewed Mahdi and several of his family members, including: Nancy; Mahdi's uncle, Nathaniel; Vera; Shareef; Mahdi's maternal aunts, Corliss Artis and Sophia Gee; Carson and Lawanda Burwell; and Mahdi's paternal aunt, Kathy.  (App. A001806-08).  And, the team consulted with Mahdi's North Carolina attorneys and their mitigation investigator, who had already spent time gathering information from Mahdi's family.  (App. A001808).  In addition, Paige Haas, the team's mitigation investigator, testified that she attempted to speak with Saleem, but was not successful.  (App. A001809).

The attorneys and experts had periodic team meetings where everyone would share information.  (*See* App. A001834-35).  And, after meeting with Mahdi's North Carolina defense team, Mahdi's attorney, Carl Grant, moved to continue Mahdi's South Carolina trial for almost one year.  (App. A001836-37).  Mr. Grant stated after talking with the North Carolina team, he "discovered that there was going to be a whole lot more information that [he] would need in order to adequately present Mahdi's case," primarily regarding Mahdi's background and family.  (App. A001836).  Judge Newman granted the motion and continued the trial from January to November 2006.  (App. A007968-69).

Further, Ms. Haas testified she visited Mahdi's elementary school in Lawrenceville and spoke with teachers there.  (App. A001824-25).  She indicated the teachers she spoke with remembered Mahdi and were familiar with him, but they had not spent "lots and lots of time" with him.  (App. A001825).  Ms. Haas also spoke by phone with individuals from Madhi's school in Baltimore.  *Id.* And, she recalled requesting records from several schools and testified it was her common practice to request records from any school she knew the defendant attended.  (App. A001803-04).  Ms. Haas stated she would have made notes from her interactions, including names and contact information,

passed on those notes to the attorneys, and included any pertinent information in a school record summary she prepared for Ms. Hammock. (App. A001813, A001825-26).[26]

When asked why he did not talk with community members or teachers, Mahdi's attorney, Mr. Walters, stated he normally relied on a defendant's family to identify other potential witnesses. (App. A001877). However, in this case, Mahdi's family was not helpful. *Id.* In addition, by Mahdi's own admission, and confirmed by his records, Mahdi was somewhat dysfunctional within the school system. (App. A001876). So, Mr. Walters stated he was not under the impression that witnesses from Mahdi's schools would testify favorably, or would not be subject to harmful cross-examination. (App. A001876-77). Mr. Walters also emphasized his reliance on the qualified experts on his team. (*See* App. A001874, A001876, A001886).

It is not unreasonable or against prevailing professional norms for counsel to rely on a qualified mitigation investigator and other experts. *See Rhodes v. Hall*, 582 F.3d 1273, 1283 (11th Cir. 2009) ("Since . . . counsel hired investigators who interviewed potential witnesses and shared all of their information with counsel, we cannot say that counsel performed deficiently by delegating the mitigation investigation to them."). In addition, as the Supreme Court has recognized, "there comes a point at which [more evidence] can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Van Hook*, 558 U.S. at 11; *see also Rompilla*, 545 U.S. at 389 ("Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there."). Thus, trial counsel are not required to "investigate every conceivable line of

---

[26]Ms. Haas's notes reflected an interview with a Ms. Pearson, whom she thought must have been one of Mahdi's teachers. (App. A001806).

mitigating evidence no matter how unlikely the effort would be to assist the defendant at

sentencing," *Wiggins*, 539 U.S. at 533, but, rather, must uphold their "duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary,"

*Strickland*, 466 U.S. at 691.

Based on the court's review of the evidence and relevant precedent, and as evidenced by the

PCR court's reversal of its position on this issue after reconsideration, the court finds "fairminded

jurists could disagree" that the record here supports the PCR court's conclusion. *See Richter*, 562

U.S. at 101. However, the PCR court's decision does not "lie well outside the boundaries of

permissible difference of opinion." *See Tice v. Johnson*, 647 F.3d 87, 108 (4th Cir. 2011) (holding

"[m]indful of the deference owed under AEDPA, we will not discern an unreasonable application

of federal law unless 'the state court's decision lies well outside the boundaries of permissible

differences of opinion.'") (quoting *Goodman v. Bertrand*, 467 F.3d 1022, 1028 (7th Cir. 2006)).

Accordingly, granting the PCR court the appropriate latitude and deference, the court finds Mahdi

has not shown the PCR court's determination was contrary to, or an unreasonable application of,

clearly established federal law or based on an unreasonable determination of the facts. *See id.* at 105

("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two

apply in tandem, review is 'doubly' so.") (citations omitted).

### Other Allegations of Deficiency

As discussed above, Mahdi did not raise the remaining portions of Ground Two in his PCR

appeal, but did raise them in his second PCR application. Thus, they are technically exhausted, but

procedurally defaulted. Mahdi advances six theories to overcome the procedural default: (1) the

issue presented in Mahdi's state certiorari petition encompasses all of Ground Two; (2) new

information discovered during federal habeas counsel's investigation has fundamentally altered Ground Two; (3) cause and prejudice under *Martinez*; (4) the court should excuse the default because PCR appellate counsel were required to brief all arguable issues; (5) ineffective assistance of PCR appellate counsel; and (6) failure to hear his claims would constitute a fundamental miscarriage of justice. (*See* ECF No. 113 at 45–52).

The court has already found that Mahdi's state petition for a writ of certiorari presented a narrower claim than presented here and the court has addressed that claim. Accordingly, Mahdi's first argument fails. Mahdi's fourth argument, that PCR appellate counsel were required to brief all arguable issues, relies entirely on state law (*see* ECF No. 113 at 50-51) and has now been denied by the state courts (*see* ECF No. 66-1). Accordingly, it is not a cognizable federal habeas claim. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, law, or treaties of the United States.") (citations omitted).

Regarding Mahdi's fifth argument, the *Martinez* exception does not cover claims of ineffective assistance of PCR appellate counsel. *See Martinez*, 566 U.S. at 16 (expressly declining to "extend [its holding] to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial"); *Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058, 2065 (2017) ("Petitioner asks us to extend *Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when

a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim. We decline to do so.").

And, the court is unpersuaded by Mahdi's sixth argument, that failure to hear his claims would constitute a fundamental miscarriage of justice, which he advances in one sentence in a footnote. (*See* ECF No. 113 at 49 n.15). A fundamental miscarriage of justice requires a showing that Mahdi is actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986). Here, Mahdi pled guilty and, other than this conclusory sentence in a footnote, has not asserted his innocence.

### Cause and Prejudice under *Martinez v. Ryan*

Pursuant to *Martinez*, Mahdi claims he can show cause to excuse the procedural default because his PCR counsel were ineffective for failing to investigate certain evidence uncovered by federal habeas counsel, namely: (1) Mahdi's race-based trauma; (2) Mahdi's physical abuse by his father; (3) Mahdi's father's mental illness and admissions to instilling violence in his children; (4) Mahdi's attempts to get his life together during the summer of 2004, before committing the instant offenses; and (5) Mahdi's grandmother's letters to North Carolina counsel, suggesting South Carolina trial counsel were not engaging with her. (ECF No. 113 at 49-50).

To support his argument, Mahdi offers the affidavit of Samuel Wiita Dworkin, federal habeas counsel's mitigation investigator. (*See* ECF No. 113-1). In their reply and motion to strike, Respondents argue the court cannot properly consider this affidavit under § 2254(e)(2).[27] (*See* ECF

---

[27] 28 U.S.C. § 2254(e)(2) states:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - -

(A) the claim relies on - -

No. 123 at 5-9; ECF No. 125 at 1-6). Respondents also note that *Martinez* "does not directly provide the authority for a petitioner to expand the record in order to further develop facts that could have been presented in the state court proceedings." (ECF No. 125 at 5-6 (quoting *Fielder v. Stevenson*, No. 2:12-cv-412-JMC, 2013 WL 593657, at *6 (D.S.C. Feb. 14, 2013)).

Respondents are correct that "[s]ection 2254(e)(2) sets limits on a petitioner's ability to expand the record in a federal habeas proceeding. . . . However, courts have held that § 2254(e)(2) does not similarly constrain the court's discretion to expand the record to establish cause and prejudice to excuse a petitioner's procedural defaults." *Fielder*, No. 2:12-cv-412-JMC, 2013 WL 593657, at *3 (citing *Cristin v. Brennan*, 281 F.3d 404, 416 (3d Cir. 2002)). Thus, where a petitioner relies on *Martinez* to show cause and prejudice, a court may find additional evidentiary development necessary to adequately consider whether PCR counsel were deficient and whether prejudice resulted from the errors and may exercise its discretion to expand the record to consider new evidence in that context. The court finds this is one of those cases and grants Mahdi's request to expand the record with respect to Mr. Dworkin's affidavit.[28] The court notes, however, its consideration of the affidavit extends solely to its evaluation of Mahdi's assertion of cause and prejudice.

---

> (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

[28]Consequently, the court denies Respondents' motion to strike (ECF No. 125) as to this exhibit.

<u>Race-Based Trauma</u>

In his affidavit, Mr. Dworkin states his investigation revealed "significant race-based trauma and a racial history story that is a core component of mitigation in [Mahdi's] case, including knowing who [Mahdi] is, where he comes from, and how the experiences of his, and his family's, past directly form mitigating information." (ECF No. 113-1 at 2). Mr. Dworkin's affidavit goes on to describe Mahdi's lineage, descending from a relationship between a slave and slave-owner; mention prominent family members; and discuss the family's roots in an area of pre-Civil War Virginia that experienced racially-motivated violence. *Id.* at 2-3. Mr. Dworkin suggests Mahdi's prominent familial history, "and the burden that that carries, likely made [Mahdi's] 'fall' so much more devastating" and that Mahdi's father's mental illness, and resulting damage to Mahdi, could be seen in Mahdi's pain at watching his cousins go on to college and become successful. *Id.* at 3-4.

Mr. Dworkin indicates race-based trauma can result in stress reactions, including suicidal ideation. *Id.* at 9. In addition, he avers that race-based trauma can have implications for an individual's behavior toward authority, something Mr. Dworkin suggests would be worth exploring in this case involving the murder of a white officer by a younger person of color.[29] (ECF No. 113-1 at 9). Mr. Dworkin states all of Mahdi's family history was readily available to trial and PCR counsel, but was not developed or investigated. (ECF No. 113-1 at 2).

-----

[29]The court notes, as Judge Newman found, that the State had not proven beyond a reasonable doubt that Captain Myers's murder stemmed from his job as a police officer. In fact, evidence at PCR suggested Mahdi did not know Captain Myers was a police officer until he got into Captain Myers's truck, after the murder. (*See, e.g,* App. A001759 ("[Mahdi] said he realized [Captain Myers] was a police officer when he got in the individual's vehicle that he took from the cabin and he could see it was an unmarked police vehicle.")). In addition, the court notes nothing in the record suggests Mahdi's crime was racially motivated. However, the court recognizes the value of presenting a full picture of a petitioner's history in capital sentencing and PCR proceedings.

The record, however, suggests otherwise. While PCR counsel may not have traced Mahdi's lineage all the way back to 1648, as Mr. Dworkin did, they did present evidence regarding Mahdi's family's history, racial views, and significant experiences with racism, and the very segregated nature of their environment. (*See, e.g.,* App. A00126061 (describing Brunswick County as "very southern, very gracious, very segregated, very entrenched in maintaining that and keeping it that way"); App. A001268 (impact on Mahdi of attending desegregated school and description of desegregation in Virginia); App. A001270 (Nancy Burwell's views of race issues and skin tone); App. A001481 ("[Brunswick County] was a very segregated community"); App. A001484-85 (Burwell family's use of slave terms); App. A001487–89 (Burwell family's attitudes about skin tone); App. A001533-36 (discussion regarding great-great-grandfather who may have gone to Harvard University); App. A001543 (Mahdi's preoccupation with conspiracy theories along racial lines product of father's influence); App. A001571 (Mahdi indicated he reached a point where he stopped listening to his father's rants about racial injustice)). Thus, while PCR counsel did not specifically proffer an argument grounded in race-based trauma, race and its implications for, and impact on, Mahdi and his mixed-race family in rural, segregated Virginia was woven throughout much of the testimony and evidence presented to the state PCR court.

"Effective assistance of appellate counsel 'does not require the presentation of all issues on appeal that may have merit.'" *United States v. Mason*, 774 F.3d 824, 828-29 (4th Cir. 2014) (quoting *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008)). Rather, the court should find ineffective assistance for failure to pursue a claim "only when ignored issues are clearly stronger than those presented." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citation omitted). And "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for

71

tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

Mahdi has not provided any information suggesting PCR counsel's failure to pursue this claim was

not strategic and the court cannot find that PCR counsel were deficient for not raising this specific

claim in light of a record indicating thorough and zealous representation, including presenting the

facts on which this claim would have been based.

Physical Abuse

In an interview with Mr. Dworkin, Nate Burwell, IV, Mahdi's first cousin, recalled Mahdi's

father, Shareef, beating both Mahdi and Saleem. (*See* ECF No. 113-1 at 6). Neither trial nor PCR

counsel interviewed Nate Burwell. However, trial and PCR counsel's teams did interview Shareef

and had continuing contact with Mahdi. It would be "unreasonable to discount to irrelevance the

evidence of [Mahdi's] abusive childhood." *Porter*, 558 U.S. at 43. However, "[a] fair assessment

of attorney performance requires that every effort be made to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Here, the record

shows that counsel and the mitigation team had significant contact with two people who would have

known about the abuse—Shareef and Mahdi—and neither disclosed this information. Counsel

cannot now be held accountable for information Mahdi and his father, though interviewed, failed to

provide at the time of sentencing or PCR proceedings. *See DeCastro v. Branker*, 642 F.3d 442, 456

(4th Cir. 2011) ("Regardless, the state court did not act unreasonably in refusing Petitioner's attempt

to upend his conviction and sentence based on the information that he failed to timely provide to

counsel.").

<u>Shareef</u>

In speaking with Mr. Dworkin, Shareef indicated that race and the family's slave roots were an important part of his identity. (ECF No. 113-1 at 4). He stated he changed his name from Thomas Burwell because, "They don't own us anymore." *Id.* Shareef described ascribing to a Jihadist mentality when the boys were young, imparting those radical views to his sons, and subjecting them to religious and racial rants. *Id.* at 5. Mr. Dworkin also mentions Shareef's mental illness, attempted murder of Vera in front of the boys, and removal of Mahdi from school. *Id.* at 4-5. Shareef stated he failed Mahdi and did not know how either of his sons survived. *Id.* at 5.

Both trial and PCR counsel's mitigation teams interviewed Shareef. However, as discussed above, counsel are not at fault if Shareef failed to provide pertinent information at the time of those interviews. In addition, the court notes that Shareef, although interviewed, did not testify, or provide an affidavit, or otherwise assist counsel at Mahdi's trial or at the PCR hearing. (*See* App. A001811 (Ms. Haas testifying Shareef was more focused on his personal beliefs than providing helpful information about Mahdi); App. A001875 (Mr. Walters testifying Shareef "refused to participate or his position was sort of standoffish and he didn't want to be involved")). Moreover, PCR counsel presented all of the information described in this portion of Mr. Dworkin's affidavit at the evidentiary hearing through other witnesses. (*See, e.g.*, App. A001464 (Shareef depressed, ranting and raving, hatred for white people); App. A001465 (Mahdi had to take care of Shareef and Saleem); App. A001467 (Shareef's home schooling consisted of teaching Mahdi how to be a warrior—"They practiced shooting and using knives and moving about in the countryside as if there was an enemy and how you could distract people and to do whatever you feel you need to do to the enemy. They were being taught that regularly on a daily basis."); App. A001421-23 (Sharon Pond testimony on

73

Shareef's involuntary commitment to mental health facility); App. A004148 (Douglas Pond stating Shareef became eccentric and radicalized after his conversion to Islam); App. A004149-51 (James Woodley's affidavit describing sending Shareef for mental health treatment and detailing Shareef's attempted murder of Vera)). Thus, Mahdi has failed to show exactly how PCR counsel were deficient in this regard.

Summer 2004

Next, Mr. Dworkin describes Mahdi's activities during the summer of 2004 after he was released from the Virginia Department of Corrections, including applying for food stamps, applying for a job, and making plans to complete his GED and attend a two-year college. (ECF No. 113-1 at 7-8). According to Mr. Dworkin, "These are steps one does not take if they are truly disengaged from society." *Id.* at 8. He suggests these actions show an attempt by Mahdi to break with Shareef's indoctrination and to take his second chance at life outside of prison seriously. *Id.* Mr. Dworkin indicates Mahdi's efforts were thwarted when his support system evaporated—when Shareef moved to Philadelphia and his grandmother and uncle no longer allowed him to live with them. *Id.*

However, while Mahdi may have engaged in these positive activities, the record and Mahdi's own statements to counsel and their experts indicate he also spent that summer attempting to create an artificial drug drought to advance his own drug distribution operation by killing, or arranging the killing of, other drug dealers. (*See, e.g.,* App. A001752-53 (Mahdi told Dr. Martin he had murdered someone in a bad drug deal in Virginia and that he left to avoid homicide detectives); App. A001788-89 (Mahdi told Dr. McKee he left Virginia because there was a rumor he killed someone and that someone had died in a drug deal, but he was not the trigger man); App. A001831-32 (Mahdi told Mr. Grant he left Virginia because he was involved in an incident where someone was killed

or stabbed); App. A001843 (Mahdi told Mr. Walters he wanted to create an artificial drought by killing a number of drug dealers so everyone would have to buy drugs from Mahdi and his associates and, in the process of implementing this plan, someone was killed)). In addition, at sentencing, trial counsel objected to testimony by a State witness that Mahdi was pedaling drugs and "knocking off" young dealers between May and July 2004. (App. A003376, 3386-87).

Thus, trial counsel could have made a reasonable strategical decision not to introduce evidence that Mahdi attempted to re-engage with society after being released from prison, which would have opened the floodgates to the introduction of even more evidence in aggravation, particularly evidence that Mahdi was dealing drugs and may have committed or been involved in another murder. *See Wong v. Belmontes*, 558 U.S. 15, 25 (2009) ("The type of 'more-evidence-is-better' approach advocated by Belmontes and the Court of Appeals might seem appealing—after all, what is there to lose? But here there was a lot to lose. A heavyhanded case to portray Belmontes in a positive light, with or without experts, would have invited the strongest possible evidence in rebuttal—the evidence that Belmontes was responsible for not one but two murders."); *Moody v. Polk*, 408 F.3d 141, 151-52, 154 (4th Cir. 2005) (finding no prejudice where additional evidence was "double-edged," as likely to harm the petitioner as to help him). Counsel's choices are presumptively reasonable, *Pinholster*, 131 S.Ct. at 1404, and "there is a strong presumption that [counsel took certain actions] for tactical reasons rather than through sheer neglect." *Id.* at 1404 (quoting Strickland, 466 U.S. at 690). *See also Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir.2003) ("[R]eview of counsels' strategic decisions as to which evidence to present at trial is 'highly deferential,' and there is a presumption that 'counsels' conduct falls within the wide range of reasonable professional assistance.' " (*quoting Strickland*, 466 U.S. at 689). The court cannot find

PCR counsel ineffective for failing to raise this meritless issue.

Nancy Burwell's Letters

Mr. Dworkin also offers evidence that Mahdi's trial counsel disengaged from the Burwell family, despite the family's desire to help with the case. (ECF No. 113-1 at 8-9). Specifically, he mentions letters from Nancy Burwell to Mahdi's North Carolina attorneys in 2005 indicating she could not reach South Carolina counsel and felt "idle in the dark." *Id.* Nancy also wrote to North Carolina counsel in March 2006, requesting they prep her for testimony. *Id.* at 9. And, in October 2006, Nancy asked North Carolina counsel to send her the name and phone number of the South Carolina attorney who took over for Mr. Grant. *Id.*

To the extent Mahdi argues PCR counsel should have presented evidence that trial counsel did not adequately engage with Mahdi's family, this claim is without merit. PCR counsel specifically argued that trial counsel did not interview enough family members, did not adequately interview the ones they did interview, and did not maintain contact with the family throughout the investigation. In furtherance of this argument, PCR counsel asked each witness whether and to what extent trial counsel, or their mitigation team, spoke with them. (*See, e.g.*, App. A001294, A001327-28, A001341-42, A001359-60, A001387-88).

Further, if Mahdi's argument is that PCR counsel should have asserted trial counsel were ineffective in failing to maintain contact with Nancy or failing to call her at sentencing, that claim also lacks merit. Trial counsel's mitigation team interviewed Nancy and had enough contact with her that she attended Mahdi's sentencing. Further, it appears trial counsel intended to call Nancy as a witness and spoke with her throughout sentencing to prepare her testimony. However, counsel testified that Nancy continued to focus on her family's accolades and would not get to the meat of

76

Mahdi's upbringing, or any particularly helpful information, so they made a strategic decision not to call her. (*See* App. A001859-60). Decisions concerning the calling of witnesses are matters of strategy left to the attorney, which ordinarily cannot constitute ineffective assistance. *Jones v. Barnes*, 463 U.S. at 808. *See also Byram*, 339 F.3d at 209 ("[R]eview of counsel's strategic decisions as to which evidence to present at trial is 'highly deferential,' and there is a presumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.' " (*quoting Strickland*, 466 U.S. at 689)). Again, counsel's choices are presumptively reasonable, *Pinholster*, 131 S.Ct. at 1404, and "there is a strong presumption that [counsel took certain actions] for tactical reasons rather than through sheer neglect." *Id.* at 1404 (quoting *Strickland*, 466 U.S. at 690). Based on the evidence in the record, there was a reasonable basis to not call Nancy as a witness.

For the foregoing reasons, Mahdi has failed to show that PCR counsel's performance was deficient. Accordingly, Mahdi has failed to show cause under *Martinez* and these portions of Ground Two remain defaulted.

### Fundamentally Altered

Finally, Mahdi asserts the new information included in Mr. Dworkin's affidavit fundamentally alters Ground Two such that "it is no longer the same claim that was presented to and adjudicated by the state courts" and is procedurally unexhausted. (ECF No. 113 at 47). New evidence in a federal habeas matter fundamentally alters a claim where the petitioner did not offer any evidence to the state courts supporting the existence of a material fact. *See Winston v. Kelly*, 592 F.3d 535, 550 (4th Cir. 2010) ("Suppose, for example, that a petitioner on federal habeas introduces new evidence to establish the existence of a fact X, a fact required to prove his claim. The claim will inevitably be stronger, regardless of the evidence the petitioner presented to the state courts.

However, if the petitioner presented *no evidence* to the state courts to establish the existence of fact X, the claim will be fundamentally altered by the new evidence presented to the district court.") (emphasis in original).

Mahdi argues PCR counsel offered no evidence to support claims of race-based trauma or the extent of Shareef's abuse and, therefore, "no reasonable fact-finder . . . could have found the facts necessary to support [these] claim[s] from the evidence presented to the state courts." (ECF No. 113 at 48 (quoting *Winston*, 592 F.3d at 551)).  However, as discussed above, the evidence in Mr. Dworkin's affidavit was included, to various degrees, in the PCR evidentiary hearing.  Thus, while Mr. Dworkin's affidavit "has perhaps strengthened [Mahdi's] claim, . . . it has not 'fundamentally altered' it."  *See Gray v. Zook*, 806 F.3d 783, 799 (2015).  The heart of the claim remains the same: Mahdi's trial attorneys should have investigated and presented more mitigating evidence regarding Mahdi's background.  *See id.*  Accordingly, Mahdi's new evidence has not fundamentally altered Ground Two and the claims remain exhausted and subject to deferential review.

### Prejudice

The court is keenly aware of the fundamental importance of this matter and the weight of this ground in particular.  It has, accordingly, conducted an exhaustive and meticulous review of the record and the parties' filings.  However, it is clear that PCR counsel and the PCR court carefully and thoroughly presented and reviewed this claim.  This claim encompassed the bulk of the evidence presented in the three-day evidentiary hearing and ninety-six pages of the PCR Order.[30]  And, after its own independent review, the court cannot find the PCR court's decision was contrary to, or an

---

[30]The court notes this not as proof of the correctness of the PCR court's findings, but as evidence of the extent and depth of its consideration of Mahdi's claims in this ground.

unreasonable application of, Supreme Court precedent, or based on an unreasonable determination of the facts as presented in the state court proceedings.

Further, even if the court accepts as true Mahdi's assertions that the PCR court made erroneous credibility determinations, the mitigating evidence presented at PCR was not cumulative of the sentencing evidence, and trial counsel did not have a reasonable strategic reason for limiting their mitigation presentation, Mahdi has not shown prejudice.

Mahdi contends additional mitigating evidence would have given context to the State's aggravating evidence, humanized Mahdi, and generally influenced Judge Newman's appraisal of Mahdi's culpability such that he could have struck a different balance and imposed a life sentence. (*See* ECF No. 113 at 41-42). The court disagrees. More humanizing information about Mahdi's unstable and troubled childhood, glimpses of his potential from elementary school teachers, and a clearer picture of his father's negative and abusive influence could not counterbalance the overwhelming evidence in aggravation, including: a video of Mahdi shooting a convenience store clerk in the face twice and casually walking out with a beer; evidence that Mahdi shot Captain Myers nine times, set fire to his body, and stole his truck and gun to run from police; Mahdi's statements to police when captured in Florida; Mahdi's extensive history of disciplinary violations in prison, including violence and threats of violence against employees and escape attempts, even when contained in SCDC's most secure unit; and the fact that Mahdi planned to effectuate an escape in Judge Newman's own courtroom.[31]

Further, along with the new mitigating information presented at the PCR evidentiary hearing

---

[31]There is also evidence of Mahdi's apparent lack of remorse in the record. *See* supra p. 57. *But see also* supra p. 56.

came new aggravating information.[32]   At least three mental health professionals had diagnosed

Mahdi with antisocial personality disorder.   (ROA 1899 (Virginia Department of Corrections

psychological evaluation diagnosing Mahdi with antisocial personality disorder and intermittent

explosive disorder); App. A001700, A001705 (Dr. Schwartz-Watts's diagnoses, including major

depression, anxiety disorder, reactive attachment disorder, paranoid personality disorder, and

antisocial personality disorder and explanation of antisocial personality disorder); App. A001756

(Dr. Martin's findings)[33]; App. A001790 (Dr. McKee's findings)).   Mahdi's brother, who grew up

---

[32]The court notes that in the record there is also new additional aggravating information, which was not available at Mahdi's sentencing.  For example, the PCR hearing itself had to take place in a parole hearing room at Broad River Correctional Institution, rather than an open courtroom, due to security concerns after Mahdi and another death row inmate brutally assaulted a guard in 2009. (*See* App. 001247; ECF No. 104 at 10 n.11; SCDC Inmate Search Detail Report for Mikal D. Mahdi (listing a disciplinary infraction on December 2, 2009, for Assault and Battery of an Employee with Intent to Kill or Injure), *available at* https://public.doc.state.sc.us/scdc-public; *see also* Glenn Smith, Assaulted Lieber Prison Guard Loses Job - Corrections Officer Stabbed 14 Times Unable to Work Due to PTSD, The Post and Courier (July 27, 2013), available at https://www.postandcourier.com/archives/assaulted-lieber-prison-guard-loses-job-corrections-officer -stabbed-times/article_1b8403dc-b5a8-5ed3-85f1-98f4b46d920d.html).  While the court has not included this new information in its current analysis, this information would most likely be presented at any re-sentencing.  *See, e.g., United States v. Stitt*, 760 F. Supp. 2d 570, 580 (E.D. Va. 2010) (noting, in the context of a  re-sentencing trial in a capital case, that "new evidence in support of a properly drafted aggravating factor . . . is appropriate and acceptable").

[33]Dr. Martin's findings seem particularly measured and illuminating:

I believe - - and this is somewhat consistent with what I found in the Carter Center reports is that [Mahdi] had a behavioral problem that led to a lot of failed relationships, interactions that were hostile aggressive, sometimes quite violent in nature, and that he had some depressive issues that were, I believe, to be subsequently recurrent due to failure to integrate into society.

I found that he was a loner; that he had - - He actually attributed a lot of his attitude and outlooks on life to his father almost in a condemning way and that he was essentially becoming a racist militant in his own way.  His outlook on life was quite violent.  His way of surviving is by force.  He seemed to have no difficulty talking about killing people if necessary in order to achieve independence.

under the same circumstances as Mahdi, witnessed the same violence, was subject to the same indoctrination and alleged abuse at the hands of their father, and acted out as a child, went into Job Corps and then the United States Army, rather than embarking on a life of crime and violence. (App. A001524 (Lawanda Burwell testifying Saleem was in the U.S. Army and had served two tours in Afghanistan); App. A001556–58 (Dr. Cooper-Lewter testifying Saleem went into Job Corps)). PCR testimony and exhibits also introduced more evidence of Mahdi's history and continued exhibition of serious disciplinary infractions, including violence, while incarcerated.[34]

And the PCR evidence illuminated some new less-than-favorable details about Mahdi's Virginia–North Carolina–South Carolina–Florida crime spree.[35] In particular, the PCR court learned that Mahdi fled from possible murder charges in Virginia after his involvement in a bad drug deal. (*See, e.g.*, App. A001843). Prior to carjacking Mr. Pitts at gunpoint, Mahdi pretended to be

_____

. . . .

And so I put with the information I gathered from the team meetings where he was very manipulative in his family and society making recurrent suicidal threats. I believe even his uncle reportedly had said he does this all the time to get his way; that his ability to follow social norms, adhere to authority was pretty much difficult to impossible at times. So I actually made the diagnosis of antisocial personality disorder for Mr. Mahdi as the primary diagnosis.

(App. A001755-56).

[34]Mahdi's complete DJJ records list over forty disciplinary violations, including assaults on teachers, guards, and other incarcerated youth and leading an escape attempt. (*See* PCR Def. Exh. 6, DJJ Discipline Information, App. A007545-862). While incarcerated in the Virginia prison system as an adult, Mahdi assaulted staff and set fire to his cell. (*See* ROA 1865; ROA 1876-2136). Mahdi was also transferred within the Virginia Department of Corrections due to his "continued poor institutional adjustment and increase in security level." (ROA 1865).

[35]The following information comes from Mr. Walters's account of information he learned through conversations with Mahdi and through his investigation.

homeless in order to take advantage of a homeless shelter's facilities and resources. (App. A001845). While staying at the homeless shelter, Mahdi realized a nearby street was used for prostitution at night, so he devised a plan to impersonate a prostitute in order to execute a carjacking. (App. A001845). On his way to Florida, in Captain Myers's truck, Mahdi stopped for gas and somehow rigged a gas pump so that the cashier would not realize he had finished pumping his gas and taken off. (App. A001847). And, when he arrived in Florida, Mahdi put on Captain Myers's uniform and investigated a crime reported by a woman who saw him on the street and assumed he was a real police officer. (App. A001847-48).

The PCR court properly weighed all of this aggravating and mitigating evidence and reasonably concluded the additional evidence offered at PCR did not create a reasonable probability Mahdi would have received a different sentence. (*See* App. A000166-81). Thus, the court cannot find the PCR court's conclusion that Mahdi failed to show prejudice was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts.

Further, from this court's own independent review of all of the evidence offered throughout the course of this matter, including the evidence at trial, the evidence at PCR, and the new federal habeas evidence, the court finds the scales remain tipped in the State's favor. The record at every stage has continued to suggest that Mahdi is violent, intelligent, manipulative, and only barely contained within our prison system. On direct appeal, then Chief Justice Toal felt so strongly about this case that she wrote a separate concurring opinion to highlight the "heinous" and "egregious" nature of Mahdi's acts. *See Mahdi v. State*, 678 S.E.2d at 808-09. After reciting the facts of Mahdi's crime, Chief Justice Toal, at that time a twenty-one year veteran of the court, concluded: "In my time

82

on this Court, I have seen few cases where the extraordinary penalty of death was so deserved." *Id.* at 809.

Therefore, even assuming that counsel were deficient in all the ways Mahdi alleges, after independently reweighing all of the aggravating and mitigating evidence, the court concludes that, absent the alleged errors, there is no reasonable probability that Judge Newman would have reached a different sentencing decision and the court remains confident in this case's outcome. *See Strickland*, 466 U.S. at 700 ("Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed."); *Plath v. Moore*, 130 F.3d 595 (4th Cir. 1997) (finding "when considered against the sheer magnitude of the aggravating evidence against [the petitioner], it is difficult to see the allegedly unreasonable omission of this mitigating evidence as prejudicial").

## Request for an Evidentiary Hearing

The court has granted Mahdi's request to expand the record and has considered the evidence offered in Mr. Dworkin's affidavit. However, for the reasons above, Mahdi has failed to show cause and prejudice to excuse the defaulted portions of Ground Two. In addition, Mahdi has not alleged any new facts that would warrant habeas relief if proven. *See Schriro*, 550 U.S. at 474 ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). Moreover, in this case, Mahdi has already received a full hearing, which included the presentation of the pertinent evidence offered in support of his claims and he has not shown, and the court has not found, any reason to question the fairness of that

hearing. Thus, the court finds no reason to expend additional judicial resources and upend the finality of the state court's determination. Accordingly, the court denies Mahdi's request for an evidentiary hearing on Ground Two.

## *GROUNDS THREE & FOUR – CONSTITUTIONALITY OF SOUTH CAROLINA'S DEATH PENALTY STATUTE*

In Ground Three, Mahdi claims South Carolina's death penalty statute, S.C. Code Ann. § 16-3-20, is unconstitutional because it automatically precludes jury sentencing following a guilty plea.[36] Although this claim was not presented in Mahdi's original PCR application, Mahdi asserts it is appropriate for habeas review because the United States Supreme Court's decision in *Hurst v. Florida*, ___ U.S. ___, 136 S.Ct. 616 (2016), established a new constitutional rule requiring jurors to make all factual findings necessary for imposition of the death penalty and that rule applies retroactively to Mahdi's sentence. Respondents contend *Hurst* did not create a new rule of constitutional law, but was an application of *Ring v. Arizona*, 536 U.S. 584 (2002), to Florida's capital sentencing scheme.

The court previously addressed this issue in its order denying Mahdi's motion to stay (ECF No. 91) and agreed with Respondents, finding "[t]he holding in *Hurst* was not a significant change

---

[36]Mahdi first presented this claim in his second PCR application as an independent ground, arguing that the United States Supreme Court's decision in *Hurst v. Florida*, ___ U.S. ___, 136 S.Ct. 616 (2016), announced a new rule of constitutional law that applied retroactively to his death sentence. Mahdi contends the second PCR court decided this claim on the merits. But, Respondents assert the second PCR court dismissed the claim as time-barred and improperly successive on adequate and independent state law grounds. The court will not decide this procedural dispute, but instead addresses this ground on the merits.

in the law as the Supreme Court simply applied prior precedent, its holdings in *Ring* and *Apprendi*,[37] to Florida's capital sentencing statutes." (ECF No. 91 at 4); *see also Hurst*, 136 S.Ct. at 621–22 (granting certiorari "to resolve whether Florida's capital sentencing scheme violates the Sixth Amendment in light of *Ring*" and analyzing Florida's statute under *Ring*'s framework). In addition, the court found the holding in *Hurst* did not apply retroactively. (ECF No. 91 at 4-5 (citing *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004) (holding that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review"); *United States v. Sanders*, 247 F.3d 139 (4th Cir. 2001) (holding the new rule announced in *Apprendi* not retroactively applicable to cases on collateral review); *Tyler v. Cain*, 533 U.S. 656, 663 (2001) (holding that a "new rule of constitutional law" is "made retroactive to cases on collateral review by the Supreme Court" only if the Supreme Court holds as much). Mahdi has not provided the court with reason to alter these findings.

Further, the court finds South Carolina's capital sentencing procedures have not violated Mahdi's constitutional rights. In *Ring*, the Supreme Court found that Arizona's capital sentencing structure violated the Sixth Amendment right to a jury trial in capital prosecutions. Under Arizona's statute, "following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determine[d] the presence or absence of the aggravating factors required" to impose the death penalty. *Ring*, 536 U.S. at 588. Applying its reasoning from *Apprendi*, the Court found that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,'" a defendant has a right to submit those factors to a jury for

---

[37]*Apprendi v. New Jersey*, 530 U.S. 466 (2000) (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

determination. *Id.* at 609. Thus, *Ring* established that when a defendant exercises his right to a jury trial on a capital offense, he is entitled to have a jury determine any aggravating factors necessary to impose a death sentence.

In *Hurst*, the Court applied its reasoning in *Ring* to Florida's capital sentencing scheme. In Florida, "[a] person who ha[d] been convicted of a capital felony [would] be punished by death" only if an additional sentencing proceeding "result[d] in findings by the court that such person [would] be punished by death." Fla. Stat. § 775.082(1) (2010) (amended 2016). Under this statute, if a jury convicted the defendant of a capital felony, a sentencing judge would conduct an evidentiary hearing before the jury and the jury would issue an "'advisory sentence' of life or death without specifying the factual basis of its recommendation." *Hurst*, 136 S.Ct. at 620 (citing Fla. Stat. § 921.141(1)–(2) (2010) (amended 2016)). "Notwithstanding the recommendation of the jury, the court, after weighing the aggravating and mitigating circumstances, [would then] enter a sentence of life imprisonment or death." Fla. Stat. § 921.141(3) (2010) (amended 2016). Thus, although the court afforded some weight to the jury's recommendation, "[l]ike Arizona at the time of *Ring*, Florida [did] not require the jury to make the critical findings necessary to impose the death penalty." *Hurst*, 136 S.Ct. at 622. Because this procedure allowed a judge to increase a defendant's maximum penalty based on his own factfinding, the Court held Hurst's sentence violated the Sixth Amendment. *Id.*

The South Carolina Supreme Court has distinguished South Carolina's statute from Arizona's (and Florida's) because, in South Carolina, "a defendant convicted by a jury can be sentenced to death only if the jury also finds an aggravating circumstance and recommends the death penalty." *State v. Downs*, 604 S.E.2d 377, 380 (S.C. 2004); *State v. Wood*, 607 S.E.2d 57, 61 (S.C. 2004). Thus, if a capital defendant in South Carolina exercises his right to a jury trial, a jury must

determine both his guilt and sentence. However, if a capital defendant pleads guilty, and waives his right to a jury trial, *Ring* is not applicable. *See id.* (finding *Ring* "did not involve jury-trial waivers and is not implicated when a defendant pleads guilty" under South Carolina's death penalty statute); *Lewis v. Wheeler*, 609 F.3d 291, 309 (4th Cir. 2010) (discussing a challenge to Virginia's capital sentencing scheme, which is functionally equivalent to South Carolina's,[38] and finding *Ring* did not hold "that a defendant who pleads guilty to capital murder and waives a jury trial under the state's capital sentencing scheme retains a constitutional right to have a jury determine aggravating factors").

During his colloquy with Judge Newman, Mahdi expressed, under oath, an understanding of his right to a jury trial and sentencing; what that trial and sentencing would require, including the State's burden of proof; the nature of the charges against him and possible sentences, including death; and that if he pled guilty, Judge Newman would determine his sentence, not a jury. (*See* App. A003219–32). Along with waiving his right to a jury trial (App. A003227), Mahdi expressly and voluntarily waived his right to jury sentencing (App. A003225). In addition, Mahdi admitted to the facts of the crime as stated by the Solicitor. (App. A003233-43).

Mahdi argues that, although he pled guilty to grand larceny and second-degree burglary and admitted to the relevant facts, in order to find the related statutory aggravating circumstances and impose the death penalty, Judge Newman had to find the additional fact that Mahdi murdered Captain Myers while committing these crimes with the use of a deadly weapon. (ECF No. 75 at 31).

---

[38]Under Virginia's capital sentencing scheme, when a defendant is charged with a death-eligible offense, the trial court first submits the issue of guilt or innocence to a jury. If the defendant is found guilty, then the same jury decides the penalty. However, if a defendant pleads guilty and waives his right to a jury determination of guilt, a judge conducts the sentencing proceeding alone and determines the existence of any aggravating factors. *See* Va. Code Ann. § 19.2-257.

However, Mahdi specifically admitted to this fact during his guilty plea:

> **THE COURT**: And did you, on or about July 18th, 2004, at around the same time and date as the murder, enter the building belonging to James E. Myers and Amy Tripp Myers without their consent, with intent to commit a crime therein? And while in the building or during the immediate flight or leaving the building, were you armed with a deadly weapon? And did you cause physical injury, including the killing of Mr. Myers with the pistol during this same burglary?
>
> **DEFENDANT MAHDI**: Yes, sir, Your Honor.
>
> **THE COURT**: And did you steal the officer's - - the 2003 Dodge Ram truck in the possession of the officer and owned by the City of Orangeburg?
>
> **DEFENDANT MAHDI**: Yes, sir, Your Honor.

(App. A003243-44).

Mahdi also asserts *Hurst* requires jurors to consider "statutory and non-statutory mitigating factors, the specific circumstances of the crime, [and] the character of the defendant." (ECF No. 75 at 32). This argument misses the central holding of *Apprendi*, *Ring*, and *Hurst* — juries must find facts necessary to *increase* a defendant's penalty. These cases do not address mitigation.

Given Mahdi's voluntary waiver and admission to the relevant facts, judicial sentencing did not violate Mahdi's Sixth Amendment rights. *See Blakely v. Washington*, 542 U.S. 296, 303, 310 (2004) (holding that under *Apprendi*, a judge may impose any sentence authorized "on the basis of the facts . . . admitted by the defendant" and noting "nothing prevents a defendant from waiving his *Apprendi* rights"). Accordingly, Mahdi's constitutional challenge to South Carolina's death penalty statute fails on the merits.

In Ground Four, Mahdi asserts his trial counsel were ineffective for failing to challenge the

constitutionality of South Carolina's death penalty statute under *Apprendi*, *Ring*, and *Blakely*.[39]

Having found South Carolina's death penalty statute constitutionally sound under these standards,

the court finds trial counsel were not ineffective for failing to raise a meritless claim.[40]  Accordingly,

Mahdi is not entitled to habeas relief on Grounds Three or Four.[41]

### *GROUNDS FIVE, SIX, & SEVEN – THE GUILTY PLEA*

In Grounds Five, Six, and Seven, Mahdi contends he involuntarily pled guilty due to trial

counsel's bad advice (Grounds Five and Six) and that trial counsel were ineffective in failing to

object to Judge Newman allegedly penalizing Mahdi for initially exercising his right to a jury trial

(Ground Seven).[42]  The Sixth Amendment's guarantee of effective assistance of counsel applies with

---

[39]Mahdi raised this ground in his initial PCR application and, pursuant to *Austin v. State*, 409 S.E.2d 395, in his second PCR application and asserts he can overcome any procedural default under *Martinez v. Ryan*.  (ECF No. 75 at 36-37).  Because the court decides this claim on the merits, it will not address the parties' procedural arguments.

[40]This is especially true given the state of the law at the time of Mahdi's trial.  In the two years prior to Mahdi's trial, the Supreme Court of South Carolina decided three cases expressly finding the death penalty statute constitutional and noting *Ring* was not implicated when a capital defendant pled guilty.  *See State v. Crisp*, 608 S.E.2d 429, 432-33 (S.C. 2005); *State v. Downs*, 604 S.E.2d 377, 380 (S.C. 2004); *State v. Wood*, 607 S.E.2d 57, 61 (S.C. 2004).

[41]In addition, the court denies Mahdi's request for an evidentiary hearing on these grounds. The court sees no basis for a hearing on these record-based claims that turn on legal interpretation and Mahdi has failed to show that his claims in Grounds Three and Four rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court" or that "the facts underlying the claim[s] would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense" or would have imposed the death penalty.  § 2254(e)(2)(A)(I), (B).  Further, regarding Ground Four, Mahdi raised this ground in his original PCR application, had a full opportunity to present any supporting evidence at the PCR evidentiary hearing, and has not alleged the discovery of any new facts since that hearing.

[42]Mahdi raised Grounds Five and Seven in his initial PCR application and in his second application pursuant to *Austin v. State*, 409 S.E2d at 395.  He only raised Ground Six in his second application.  Because the court decides these claims on the merits, it will not address the parties'

equal force to critical pretrial matters, including deciding whether to plead guilty. *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012); *Hill v. Lockhart*, 474 U.S. at 58. *Strickland*'s two-part test governs the court's analysis, but here, the prejudice prong "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. at 59. "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* This inquiry "focuses on a defendant's decisionmaking" and does not turn on the outcome of a defendant's actual criminal proceeding or potential outcome had a defendant chosen to proceed to trial. *Lee v. United States.*, __ U.S. __, 137 S.Ct. 1958, 1966 (2017).

Mahdi asserts his trial counsel were ineffective for failing to adequately advise him of the advantages of jury sentencing (Ground Five) and for indicating Judge Newman would consider his guilty plea as mitigating evidence (Ground Six). The court finds Mahdi's assertions are directly contradicted by the record.

After the jury was impaneled, but before it was sworn, Mahdi and Mr. Walters had an ex parte meeting with Judge Newman to inform the court Mahdi was considering pleading guilty. At this meeting, Mr. Walters indicated he and Mahdi had discussed the implications of Mahdi's decision, including the "pluses and minuses" of jury sentencing and Judge Newman's policy of not agreeing to a certain sentence based on a plea:

---

procedural arguments. However, the court notes its findings here are consistent with the PCR court's findings on Grounds Five and Seven (*see* App. A000080-85) and the court's conclusion that Ground Six lacks merit forecloses Mahdi's argument that its default can be excused under *Martinez*. Thus, under either standard of review, these grounds are subject to summary judgment.

Your Honor, I've discussed with my client options that are available with regards to this case. Mr. Mahdi is very intelligent and in conveying the options to him, of course, he's aware of the fact that there are two phases to a trial, the guilt phase and also the sentencing phase, if it should get to that point.

. . . .

What's been conveyed to Mr. Mahdi is, is that there are no guarantees with regards to either process. We have a jury that's been empanelled [sic] and there are certain pluses and minuses with that jury. And, of course, Mr. Mahdi's in a position where he's saying, well, what about the Judge. And, of course, Your Honor's conveyed from the beginning that there is no policy by this Court that they will agree to a plea or agree to a certain sentence being reduced.

So I've explained to him that there are no guarantees wherever you go. And, of course, he's pondering the issue of whether he should proceed forward with trial or whether he should go in front of Your Honor and plead guilty.

Of course, with the second phase with regards to the sentencing phase, he has been informed that the State will have to put up their case and information and, of course, he'll be allowed to put up information. The question is whether he will do that in front of a jury or whether he will do that in front of a judge. And, again, there are no guarantees and there are pluses and minuses with regards to either option that he pursues.

(App. A003205-06). In addition, Judge Newman reiterated to Mahdi and Mr. Walters his "long-term policy" of considering all of the evidence in a case before determining the outcome, rather than "decid[ing] a case in chambers" based on a guilty plea. (App. A003209).

After this exchange, Mahdi had the rest of the day and the next morning to speak with counsel and his grandmother and think about his decision. (App. A003207-09). In court the next day, Mr. Walters stated he had thoroughly discussed the case with Mahdi and continued to counsel him after the ex parte meeting and again the following morning regarding his decision to plead guilty. (App. A003212). During his plea colloquy, Mahdi indicated that he understood how a jury trial and sentencing would proceed and the rights he was choosing to waive. (App. A003223-27).

91

Further, Mahdi stated he had enough time to discuss his decision with his attorneys, understood those discussions, and was completely satisfied with his attorneys' services. (App. A003227-29).

Mr. Walters offered additional insight into Mahdi's decision at the PCR evidentiary hearing, stating definitively that they wanted Judge Newman to sentence Mahdi because there was a better chance a judge would be able to remain focused on the issues, even after viewing the videotape of Mahdi murdering Mr. Boggs, and because it was close to Christmas and they were concerned an antsy jury might rush its decision. (App. A001922-23). This is the extent of the evidence in the record regarding conversations between Mahdi and trial counsel regarding the decision to plead guilty. The court finds nothing in this evidence to rebut the presumption that trial counsel provided effective representation and adequately advised Mahdi so that he could make a fully-informed decision to plead guilty.

In his response to the motion for summary judgment, Mahdi suggests for the first time that trial counsel were ineffective for advising him to plead guilty without obtaining a written guarantee that his plea would result in a life sentence. (ECF No. 113 at 64). In support, Mahdi cites to the ABA Guidelines[43] and a 2012 affidavit from PCR counsel, Teresa Norris, both of which instruct counsel to be wary of participating in a client's waiver of his trial rights without a written guarantee that death will not be imposed after a guilty plea. *Id.* at 65. However, other than these brief references to advisory authorities, Mahdi offers nothing to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466

---

[43]Mahdi specifically cites to the Commentary to the ABA Guideline 10.9.2, which provides, "If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights." (ECF No. 113 at 65).

U.S. at 689.[44]  Thus, not only is this claim clearly procedurally barred, but Mahdi fails to show counsel's failure to obtain a written plea agreement amounts to constitutional ineffectiveness.

Mahdi also contends trial counsel "affirmatively misadvised" him that Judge Newman would consider his guilty plea in mitigation, leading Mahdi to believe he would not receive a death sentence if he pled guilty.  (ECF No. 113 at 68-69).  The court finds trial counsel are not at fault for Mahdi's alleged misunderstanding that his guilty plea would automatically preclude a death sentence.  The record suggests Mr. Walters explicitly informed Mahdi that pleading guilty did not guarantee a life sentence.  (App. A003205-06).  Or, at the very least, Mahdi was present when Mr. Walters made this statement to Judge Newman.  And, Judge Newman instructed Mahdi that he would decide between the two possible sentences after considering all of the evidence both at the ex parte meeting (App. A003209) and during the plea colloquy (App. A003223 (Mahdi stating he understands that the possible sentences in the case, if Judge Newman accepts his guilty plea, are life without the possibility of parole or death); A003224-25 (expressing understanding of what jury sentencing would entail and voluntarily waiving his right)).

Further, trial counsel's advice was not incorrect.  Mr. Koger opened the defense's penalty phase case by pointing to Mahdi's full acceptance of responsibility by admitting guilt.  (App. A003251).  Judge Newman expressly incorporated the guilty plea into the penalty phase.  (App. A003253).  In his closing argument, Mr. Walters continued to emphasize Mahdi's acceptance of responsibility and admission of guilt.  (App. A003677, 3683, 3684).  Counsel argued Judge Newman should consider Mahdi's guilty plea as a nonstatutory mitigating circumstance.  (App. A003698).

_____

[44]The court finds these sources fall short of establishing obtaining written sentence guarantees in capital cases as a prevailing professional norm.  As discussed earlier, the ABA Guidelines are merely guidelines.  *See* supra p. 60.

And, in his sentencing order, Judge Newman stated:

> The defendant's guilty plea occurred during the fourth day of his trial following jury selection, but prior to the jury being sworn. This was one day following his attempted escape through the use of a homemade key. In addition, Mr. Mahdi has failed to demonstrate any remorse for his actions at any point in time known to this Court. Therefore, I conclude that no significant weight should be given to this nonstatutory mitigating circumstance and the Court's ultimate decision as to the sentence to be imposed.

(App. A003698-99).

Mahdi asserts this portion of the sentencing order shows Judge Newman not only did not consider Mahdi's guilty plea as mitigating evidence, but actually penalized Mahdi for exercising his right to a jury trial before deciding to plead guilty. The court disagrees. In considering a guilty plea as mitigation for sentencing, the judge is also evaluating the defendant's acceptance of responsibility for his crime. Acceptance of responsibility can also be evidenced through expressions of remorse or actions suggesting a genuine desire to submit to an appropriate penalty or make positive behavioral changes.

Here, Judge Newman considered Mahdi's guilty plea, but in context. Waiting to plead guilty until after the selection of a jury could suggest a decision that is more strategic in nature. And Mahdi's attempted escape one day prior to pleading guilty is inconsistent with an acceptance of responsibility for his crime. Judge Newman, who was in a unique position to assess these factors, did not refuse to consider Mahdi's guilty plea or penalize him for the timing. Instead, he properly assessed how the plea, in context, reflected Mahdi's character and, in particular, his alleged acceptance of responsibility. This is exactly the type of individualized consideration required in capital sentencing. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the

conclusion that an individualized decision is essential in capital cases.").

The Supreme Court has cautioned that, because "the strong societal interest in finality has 'special force with respect to convictions based on guilty pleas,' . . . [c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for an attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee*, 137 S.Ct. at 1967 (quoting *United States v. Timmreck*, 441 U.S. 780, 784 (1979)). Having carefully considered the contemporaneous record evidence, the court finds Mahdi has failed to show deficiency or prejudice under *Strickland* and *Hill*.

To support Grounds Five through Seven, Mahdi has requested an evidentiary hearing "regarding the facts and circumstances that led to Mr. Mahdi pleading guilty, including the nature and extent of the advice provided to Mr. Mahdi by his trial counsel." (ECF No. 113 at 70). However, although presented with the opportunity, Mahdi did not offer evidence supporting Grounds Five and Seven in state court. And, he offers none now. Mahdi has not supported any of his conclusory allegations in these grounds with evidence, such as affidavits from previous counsel or from Mahdi himself regarding communications surrounding the decision to plead guilty.[45]

---

[45]Mahdi does provide two affidavits from his PCR counsel, both of which state that *Lafler v. Cooper*, 566 U.S. 156 (2012), and *Missouri v. Frye*, 566 U.S. 134 (2012), were decided after the evidentiary hearing, but before the PCR court's order of dismissal, that PCR counsel did not discuss moving to re-open the evidentiary hearing or otherwise supplement the record after those decisions, and that counsel did not discuss *Lafler* or *Frye* with Mahdi. (ECF Nos. 113-4, 113-5). These affidavits hint at allegations of ineffective assistance of PCR counsel. However, because the court decides these claims on the merits, it does not reach the issue of cause and prejudice to excuse default. Moreover, the Supreme Court has not held that the holdings in these cases established a new right retroactively applicable to cases on collateral review, and these cases are distinguishable as they involved the rejection of a plea offer, which is inapplicable to Mahdi's case as there were no plea negotiations (ROA 1355-56). *See Lafler*, 566 U. S. at 172 (holding that Sixth Amendment right to counsel is violated when a defendant receives a harsher sentence as a result of counsel's deficient advice to reject a plea bargain); *Frye*, 566 U.S. at 147 (holding that Sixth Amendment right to

Further, Mahdi has not alleged specific facts he could bring to light through an evidentiary hearing that would contradict the record evidence or alter the court's analysis of these issues. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). In addition, because Mahdi has failed to show his defaulted claims in Ground Six are substantial, he is not entitled to an evidentiary hearing on those claims. Accordingly, the court finds Mahdi is not entitled to relief on Grounds Five, Six, and Seven and denies Mahdi's request for an evidentiary hearing on these grounds.

## CONCLUSION

After a thorough review of the record and the filings in this case pursuant to the standards set forth above, the court finds Mahdi's Petition without merit. Accordingly, Respondents' motion for summary judgment (ECF No. 105) is **GRANTED**; Respondents' motion to strike (ECF No. 125) is **GRANTED in part AND DENIED in part**; and the Petition (ECF No. 75) is DENIED **with prejudice**.

A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating that reasonable jurists would find both that his constitutional claims are debatable and that any dispositive procedural rulings by the district court are also debatable or wrong. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). In the instant

---

counsel is violated when counsel failed to inform the defendant of a plea offer from the government). Accordingly, Respondents' motion to strike (ECF No. 125) is granted as to these two exhibits.

matter, the court finds that Petitioner has failed to make "a substantial showing of the denial of a constitutional right." Accordingly, the court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

s/Timothy M. Cain
United States District Judge

September 24, 2018
Anderson, South Carolina